UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JASON CLINARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 3:13-cv-01190 |
| v. | ) | Chief Judge Crenshaw |
| | ) | Magistrate Judge Brown |
| | ) | |
| RANDY LEE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

To: The Honorable Waverly D. Crenshaw, Jr., Chief United States District Judge

## REPORT AND RECOMMENDATION

This action was referred to the Magistrate Judge to hold a juvenile transfer hearing and issue a Report and Recommendation. (Docket Entry No. 56). For the reasons stated below, the Magistrate Judge **RECOMMENDS** that based upon the evidence at the time of the August 2, 2005 transfer hearing the state court should have transferred Petitioner to be dealt with as an adult in the criminal court of competent jurisdiction.[1]

## I. PROCEDURAL HISTORY AND BACKGROUND

In March 2005, Petitioner, Jason Clinard, was charged with first-degree murder in the Juvenile Court of Stewart County, Tennessee, with Judge Andrew Brigham presiding. *Clinard v. Lee*, 722 F. App'x 552, 555 (6th Cir.), *cert. denied*, 139 S. Ct. 123 (2018). The State moved to transfer Petitioner to adult court on those same charges, and a transfer hearing was held on August

---

[1]Petitioner has a pending motion to dismiss (Docket Entry No. 66) the petition to transfer based upon constitutional grounds that is for the District Judge to decide. (Docket Entry No. 71). As stated earlier in the Magistrate Judge's Order, the mandate of the Sixth Circuit and the referral to the Magistrate Judge are for the Magistrate Judge to conduct a new transfer hearing to determine whether there should have been a referral to adult court had a proper hearing been held. *Id.*; Docket Entry No. 83, at 5.

2, 2005. *Id*. at 553, 555-56. After certain testimony, the juvenile court recessed and held an in-chambers hearing. *Id*. at 557. During that in-chambers discussion, Petitioner agreed to the transfer. *Id*. The parties presented an agreed order stating that the elements of the transfer statute were satisfied, and Judge Brigham signed the order, transferring Petitioner to the jurisdiction of Stewart County Circuit Court. *Id*.

Following the transfer from juvenile court, a jury convicted Petitioner of first-degree premeditated murder. *Id*. at 553. Because the State did not seek a sentence of life imprisonment without the possibility of parole, Petitioner received the statutorily mandated sentence of life imprisonment. *State v. Clinard*, No. M2007-00406-CCA-R3CD, 2008 WL 4170272, at *2 (Tenn. Crim. App. Sept. 9, 2008).[2] The Tennessee Court of Criminal Appeals affirmed Petitioner's conviction and sentence on direct appeal. *Id*. at *2-7. Petitioner did not seek further review of that decision. *Id*. at *1.

On January 29, 2009, Petitioner filed a *pro se* post-conviction petition in the Criminal Court for Stewart County, and the post-conviction court appointed counsel and scheduled an evidentiary hearing. *Clinard v. State*, No. M2012-00839-CCA-R3HC, 2012 WL 4459717, at *2 (Tenn. Crim. App. Sept. 27, 2012); Docket Entry No. 33-8. The state trial court conducted an evidentiary hearing, and at the hearing, Judge Brigham testified that he was surprised by Petitioner's decision to agree to the transfer, as Petitioner had not presented any witnesses other than Dr. William Bernet, and that he had not made a decision as to how he would rule on the transfer issue. *Clinard v. State*, No. M2011-01927-CCA-R3PC, 2012 WL 6570893, at *3 (Tenn. Crim. App. Dec. 17, 2012). Judge Brigham testified that "he was going to consider possible rehabilitation programs available to the

_____

[2]Thus, under Tennessee law, Petitioner must effectively serve at least 51 years in prison. *Clinard*, 722 F. App'x at 553 n.1 (citing *Vaughn v. State*, 202 S.W.3d 106, 118-19 (Tenn. 2006)).

Petitioner in juvenile court, the Petitioner's amenability to rehabilitation, and evidence showing the existence of premeditation." *Id*. Judge Brigham further testified that he was concerned about Petitioner being released from custody at nineteen because that was "'a relatively short period of time'" and acknowledged that Petitioner would have had to present "overwhelming proof" that Petitioner could be rehabilitated before he would have determined not to transfer the case to circuit court. *Id*. at *4. Following the post-conviction evidentiary hearing, the post-conviction court found that trial counsel's performance was deficient for failing to attempt to prevent the transfer by using mental health testimony, but concluded that Petitioner did not suffer any prejudice arising from counsel's deficiency because there was no reasonable probability that Petitioner would not have been transferred to adult court had all of the evidence been presented. *Id*.

During the pendency of the post-conviction appeal, on February 15, 2012, Petitioner filed a *pro se* petition for habeas corpus relief, which the habeas corpus court summarily dismissed and that was affirmed by the Tennessee Court of Criminal Appeals on September 27, 2012. *Clinard*, 2012 WL 4459717, at *1-2.[3]

On December 17, 2012, the Tennessee Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief. *Clinard*, 2012 WL 6570893, at *1. On May 8, 2013, the Tennessee Supreme Court denied Petitioner's application for permission to appeal the state post-conviction action. *Id*.

On October 28, 2013, Petitioner filed his *pro se* federal habeas petition. (Docket Entry No. 1). On May 2, 2016, Petitioner's Court appointed counsel filed an Amended Petition (Docket Entry No. 30) that the District Court denied on October 6, 2016. (Docket Entry Nos. 45-46). On appeal,

_____

[3]On February, 15, 2013, the Tennessee Supreme Court denied Petitioner's application for permission to appeal the state habeas action. *Clinard*, 2012 WL 4459717, at *1.

the Sixth Circuit reversed and remanded, instructing this Court to hold a new transfer hearing. *Clinard*, 722 F. App'x at 566. The Sixth Circuit stated, "Here, because there is a reasonable probability that [Petitioner] would not have been transferred to adult court absent his counsel's ineffective assistance, [Petitioner] is entitled to a new transfer hearing." *Id*.

On October 15, 2018, the District Judge referred this action to the Magistrate Judge to hold the juvenile transfer hearing and issue a Report and Recommendation. (Docket Entry No. 56). On April 8, 2019, t he Magistrate Judge commenced a two-day transferring hearing. (Docket Entry Nos. 82-84). The parties filed their post-hearing briefs on June 26, 2019. (Docket Entry Nos. 85-86).

## II. REVIEW OF STATE COURT RECORD AND TRANSFER HEARING

On March 2, 2005, Petitioner, Jason Clinard, who was fourteen years old at the time, shot and killed Joyce Gregory, his bus driver, when he boarded the bus in front of his house. *Clinard*, 2012 WL 6570893, at *1. On the day prior to the shooting, the victim had reported Petitioner to school officials for dipping snuff on the bus, and, as a result, Petitioner received an in-school suspension for the infraction. *Id*. Petitioner had also been previously suspended from riding the bus for fighting and had only recently returned to riding the bus on February 25, 2005. *Id*. On the morning of the shooting, Petitioner got ready as usual for school and ate breakfast. *Id*. Petitioner walked with his two nephews to the bus, insisted that his nephews board first, and then, as his nephews walked to the back of the bus, he fired six jacketed hollow point bullets from a .45 caliber semiautomatic handgun. *Id*. Three shots struck the victim, killing her. *Id*. Petitioner retreated to the woods behind his house and was later called on his cellular telephone and was convinced to exit the woods and surrender to police. *Id*. at *2.

Later that same morning, shortly after Petitioner's arrest, TBI Agent Joe Craig conducted a tape-recorded interrogation of Petitioner. (Docket Entry No. 41-10, at 41-50).[4] Petitioner explained that he obtained the gun from his father's closet and loaded it. *Id*. at 42, 49. Agent Craig asked Petitioner what caused him to be upset with the bus driver, to which Petitioner responded, "I hate her," and explained that he did not like her attitude and felt that she singled him out. *Id*. at 45. Agent Craig and Petitioner subsequently had this colloquy:

Agent: . . . [W]hen did you decide you were going to shoot the bus driver?

Petitioner: I don't know what time . . . it was after six.

Agent: It was after six . . . when you went and got the gun out of the closet . . . at that point did you know what you were going to do?

Petitioner: No sir, at first I thought about shooting myself.

Agent: Okay.

Petitioner: I like living too much . . . so . . .

Agent: I understand . . . uh . . . until you got then . . . you didn't know . . . when did you realize you really want to shoot her and you were going to shoot her . . . . that's pretty much . . . .

Petitioner: Probably about the time the bus started coming down the road.

Agent: Okay. When you . . . when you saw the bus?

Petitioner: Yes sir.

Agent: And . . . and that made you feel angry toward her.

Petitioner: Yes sir.

*Id*. at 46-47.

---

[4]Unless otherwise stated, citations are to the Court's ecf pagination. References to actual transcript pages are denoted with a "p.".

Petitioner stated that after he retreated to the woods, he began thinking and started walking to the Cumberland City Courthouse. *Id*. at 44. Later in the conversation, Petitioner admitted that he knew beforehand that shooting the bus driver was wrong and that he would be placed in jail as a result. *Id*. at 48. Later at the jail while he was being fingerprinted, Petitioner reportedly stated to Agent Craig, "I didn't think I had it in me, but I guess I did," and "I wish I could turn back time." (Docket Entry No. 66-1).

Petitioner was subsequently charged with first-degree murder in the Juvenile Court of Stewart County, and Petitioner was placed in the Middle Tennessee Mental Health Institute ("MTMHI"). *Clinard*, 722 F. App'x 552 at 555. The State moved to transfer Petitioner to adult court on those same charges, and a transfer hearing was held on August 2, 2005. *Id*. at 553, 555-56. At the hearing, the parties stipulated to the admission of the court-ordered MTMHI evaluation of Petitioner, prepared by licensed psychologist M. Duncan Currey, Ph.D., who diagnosed Petitioner as suffering from "'Major Depressive Disorder, Recurrent, Severe, With Psychotic Features,' i.e., auditory and visual hallucinations." *Id*. at 556.

Because of a scheduling issue, Petitioner's witness, Dr. William Bernet, the Director of Forensic Psychiatry at Vanderbilt University, was able to testify out of order as a witness for Petitioner. *Id*. at 555-56. Dr. Bernet testified that, after reviewing the relevant records and evaluating Petitioner first-hand, Petitioner "suffered from 'major depressive disorder,' 'intermittent depressive disorder,' and 'intermittent explosive disorder.'" *Id*. at 556. Dr. Bernet opined that Petitioner could be appropriately treated within the juvenile-justice system and that treatment up to the age of nineteen should be long enough to address his psychiatric issue. *Id*. at 556-57; Docket Entry No. 65-1, at pp. 112, 117. However, Dr. Bernet acknowledged that there could be no guaranty

that treatment would be successful or that Petitioner would not reoffend, particularly given that Petitioner was predisposed to depression due to a genetic variation that affected how his brain processes serotonin and that predisposition would stay with him for life. *Id*. at 557; Docket Entry No. 65-1, at pp. 111-12.

The state called psychiatrist Kimberly Stalford, who reviewed Petitioner's MTMHI records, but did not interview Petitioner. *Id*. Based upon her review of the records, Dr. Stalford concluded that Petitioner did not suffer from a major depressive disorder and opined that Petitioner did not experience hallucinations or suffer from true psychosis, but instead was engaged in delusional thinking. *Id*. Dr. Stalford concluded that, to the extent that Petitioner had depression, it was "'significantly less than what Dr. Bernet'" had diagnosed. *Id*.; Docket Entry No. 65-1, at p. 127.[5] Dr. Stalford acknowledged that while depression is a treatable medical problem, Petitioner's genetic predisposition to depression could not be treated. *Id*. at 557. As to rehabilitation, Dr. Stalford opined that "'the best predictor for violence is a previous history of violence, and the severity of the violence is an important issue,'" but she did not actually opine as to the likelihood that Petitioner might reoffend. *Id*.; Docket Entry No. 65-1, at p. 132.

The State then presented testimony from two police officers regarding the shooting, as well as Petitioner's two nephews. *Id*. at 557. One of the police officers, Jason Gillespie, testified that he called Petitioner's cellular telephone following the shooting and that Petitioner stated that he was in

---

[5]On cross examination, Dr. Stalford explained that she did not conclude that Petitioner did not have any major depressive disorders, but that she did not believe that Petitioner "had the severity that [her] colleagues were diagnosing him with," and that where she "slightly disagree[d]" with her colleagues was as to the severity of the depression in which they diagnosed him. Docket Entry No. 65-1, at pp. 133, 135-36. On redirect examination, Dr. Stalford reiterated that she did not believe that Petitioner's "depression was severe enough to interfere with his ability to make a decision or to rationalize." *Id*. at p. 160.

the woods behind his house and was walking to the police station, but Petitioner did not state why. (Docket Entry No. 65-1, at pp. 214-15). Both of Petitioner's nephews testified that on the morning of the shooting Petitioner was uncharacteristically wearing a really big jacket, which appeared to be a couple of sizes too big for him. *Id.* at pp. 224-25, 233, 240. One nephew, Joseph Fults, testified that Petitioner had stated on prior occasions that he hated the bus driver because she was real mean and picked on him. *Id.* at p. 229. The second nephew, Bobby Fults, also testified that Petitioner stated on numerous occasions that he did not like the bus driver. *Id.* at p. 247.

Following this testimony, the court recessed and held an in-chambers hearing where Petitioner agreed to the transfer. *Clinard*, 722 F. App'x at 557. Petitioner was fifteen years old at the time of his original transfer. *Id.*

### III.  FEDERAL COURT TRANSFER HEARING [6]

#### A.  Testimony of Rebecca Grasty

At the April 2019 transfer hearing, Rebecca Grasty, Petitioner's former Algebra teacher, testified that Petitioner was an "ideal student," who was "very well-mannered" and "quiet." (Docket Entry No. 83, at 11-13). Petitioner was friendly with other students, and Grasty did not ever observe him display any "violent tendencies." *Id.* at 13, 15-16. Grasty also did not observe signs of depressive or suicidal behavior. *Id.* at 15-16.

#### B.  Testimony of Myles Holliday

Myles Holliday, Petitioner's former football coach, testified that he believed that Petitioner would be one of the building blocks to a strong foundation on the football team because Petitioner

---

[6]In an earlier ruling, the Magistrate Judge determined that the evidence would be limited to the facts and opinions formulated at the time of the transfer hearing on August 2, 2005. (Docket Entry No. 71; Docket Entry No. 81; Docket Entry No. 83, at 36, 211).

"showed that he had good character and was going to be a good teammate." *Id*. at 17-18, 20, 25. Petitioner exhibited good attendance at practice, "worked extremely hard," and was a good teammate. *Id*. at 20. Petitioner was not overtly aggressive or violent as a football player. *Id*. at 23-24. During their football interactions, Holliday did not observe any depressive or suicidal behavior exhibited by Petitioner. *Id*. at 26-27.

On the day before the shooting, Holliday saw Petitioner sitting outside of the assistant principal's office and inquired as to why Petitioner was there. *Id*. at 21. Petitioner answered that he hated his bus driver, which Holliday found "shocking because it was really out of character" for Petitioner. *Id*. Holliday attempted to counsel Petitioner and advised him to accept whatever the punishment was and to learn from it. *Id*. at 21-22.

### C.  Testimony of Carrie Pellum-Howell

Carrie Howell, Petitioner's former World Geography teacher, testified that Petitioner was "quiet" and "polite" and a student whom she could trust. *Id*. at 29-31. Petitioner was "very helpful," was never disruptive and had friends. *Id*. at 31-32. Howell never saw Petitioner show any anger or exhibit any signs of depression or suicidal behavior. *Id*. at 33-34.

### D.  Testimony of Dr. Duncan Currey

Duncan Currey, a clinical psychologist, Ph.D., who was offered as an expert in child and adolescent psychology, testified that he personally evaluated Petitioner at Middle Tennessee Mental Health Institute ("MTMHI"), where Petitioner was sent for a juvenile court-ordered mental health evaluation immediately after the shooting. *Id*. at 35-36, 38. According to Dr. Currey, Petitioner did not have a history of legal trouble or of receiving mental health treatment. *Id*. at 55-56. Petitioner was at MTMHI for twenty-six days. *Id*. at 38; Plaintiff's Collective Ex. A, at P1, P147, P183.

During that time, Dr. Currey met with Petitioner "regularly," for a total of at least five hours to ten hours one-on-one, and when making his rounds he also made behavioral observations. *Id*. at 38-39.[7]

Dr. Currey testified that Petitioner reported having future interests in becoming a mechanic or joining the military. *Id*. at 90. Petitioner reported that he enjoyed playing football, deer hunting, weightlifting, and working on cars. *Id*.; Plaintiff's Collective Ex. A, at P3. Dr. Currey testified that Petitioner reported having suicidal thoughts in autumn 2004 and that he had difficulty sleeping, although Petitioner did not report having any suicidal thoughts while at MTMHI. *Id*. at 43-45, 90. Petitioner described himself as having a "short temper" and said that he "tended to get angry easily." *Id*. at 45. Petitioner also described experiencing blackouts from his anger where he would "do things while he was angry and then not remember them later." *Id*. at 46. Dr. Currey testified that Petitioner also reported being involved in a couple of fights at school, that one time Petitioner was given in-school suspension in the ninth grade for telling a teacher to shut up, and that Petitioner was twice given out-of-school suspension in the seventh grade for fighting. *Id*. at 47. Petitioner also got into fights with some of the foster children who would stay with his family. *Id*. In his evaluation, Dr. Currey did not view the fighting incidents to be a major issue as Petitioner did not get into fights any

_____

[7]A psychiatric technician, i.e., "a person who's trained in basic behavioral principals who assist the clinical staff in maintaining order on the unit," was assigned as one-to-one coverage of Petitioner for 24 hours a day. (Docket Entry No. 83, at 39). Dr. Currey testified that nurses, recreation therapists, psychiatric technicians, physicians, psychiatrists and psychologists comprised his treatment team. *Id*. at 40. Dr. Currey testified that the MTMHI nurses spent most of their time in an inner office doing paperwork and would look through two sets of glass and make distance observations of patients in the day room. *Id*. at 41, 93-94. Dr. Currey testified that the "nurse's job was to really track what was going on on the unit, so certainly it's important" and that he "would check the nurse's notes and . . . would talk to the nurses that saw [Petitioner]," but because the nurses were generally very busy, the people with the most interaction with the patients were the psychiatric technicians. *Id*. at 41-42. As a result, Dr. Currey stated that because the hospital unit is designed to control adolescents' behaviors while they're there, the nurses' notes "are actually very cursory routine notes," but noted that the notes were "important because [they] ha[ve] to be a report of what's happening at that moment on the unit," although they were "not a clinical evaluation." *Id*. at 93-94.

more than other children at school "and that the behavior problems that he'd had were fairly typical schoolboy-type rouses." *Id*. at 48. Petitioner reported that for a couple of years he experienced hearing voices, or "command auditory hallucinations," that told him to hurt himself or others. *Id*. at 48-49. Petitioner also reported visual hallucinations, such as seeing his dead dog, but Dr. Currey explained that such hallucinations are not unusual as they could be related to grief or being accustomed to that animal. *Id*. at 50.

Dr. Currey identified several psychosocial stressors for Petitioner, which included the deaths of his pet dog of ten years and his grandmother, previous fights with foster children in his home, attempted suicides by a friend and by another classmate who were both about 14 years old, an automobile-related fatality of a teammate the previous summer, and a bleeding ulcer. *Id*. at 50-53; Plaintiff's Collective Ex. A, at P5. Dr. Currey believed that the main stressor was that Petitioner's older stepsister, her husband, and her twin 16-year-old sons had recently moved in with Petitioner's family, which resulted in Petitioner having to sleep on the floor in his parents' bedroom. *Id*. at 53-54. Petitioner felt that his stepsister "picked on him" and that her twin sons "acted immature." *Id*. at 54. Dr. Currey cited Petitioner's concern for his father's health and his dog and his rasing a sheep in 4-H as examples of empathetic behaviors. *Id*. at 55.

Dr. Currey administered a battery of psychological tests. *Id*. at 57. Dr. Currey testified that the tests "suggested that he was experiencing depression but not what we think of as severe psychological pathology that . . . [is] typically associated with acting-out behavior." *Id*. at 57-58. These tests did not show malingering, nor did Dr. Currey himself see any signs of malingering. *Id*. at 58. Dr. Currey diagnosed Petitioner with major depressive disorder, recurrent, severe with

psychotic features. *Id*. at 58-59. Dr. Currey also made a lesser diagnosis that Petitioner had alcohol abuse by history. *Id*. at 60, 75-76.

Dr. Currey opined that Petitioner's "depression most likely compromised his judgment and reasoning skills, and put him at increased risk for inappropriate behavior, such as acting on his angry impulses." Plaintiff's Collective Ex. A, at P10. Dr. Currey stated that "[s]uicidal thoughts in children sometimes reflect feelings of guilt and shame that can manifest in self-destructive behaviors, or in aggression toward others." (Docket Entry No. 83, at 67; Plaintiff's Collective Ex. A, at P10).

Dr. Currey also observed that while at MTMHI Petitioner responded well to a structured, supportive environment during the evaluation, and his potential for learning to manage his behavior appropriately would probably increase with ongoing supervision and guidance. *Id*. at 67; Plaintiff's Collective Ex. A, at P10. Dr. Currey recommended that Petitioner be placed "in an adolescent residential treatment program where he c[ould] receive individual and group therapy, family counseling, anger management training, and psychiatric monitoring of his medication." Plaintiff's Collective Ex. A, at P10. Dr. Currey explained that, in 2005, there were facilities available through the Department of Children's Services ("DCS") that could have provided counseling, treatment and medication for Petitioner. (Docket Entry No. 83, at 68-69). Dr. Currey testified that depression "is very treatable" and that it "requires treatment over a period of time." *Id*. at 69. Dr. Currey opined "with a reasonable degree of medical certainty that [Petitioner] could probably be rehabilitated in the course of a couple of years if he received these services that are available." *Id*. Dr. Currey further opined that "despite the nature of his charges" Petitioner posed "a low risk of further violence." *Id*. at 70. Dr. Currey also opined that the statement, "that history of violence is the best predictor of violence," was an "adage" or "generalization" and that "when you take someone with no history of

violence [like Petitioner], it's a -- it's really a gross generalization. You can look at many other variables." *Id*. at 63, 64-65.[8]

### E. Testimony of Dr. William Bernet

William Bernet, who is a board certified expert in general psychiatry, child and adolescent psychiatry, and forensic psychiatry, was hired by the defense in 2005 to conduct a forensic psychiatric evaluation of Petitioner. *Id*. at 129, 133. Dr. Bernet evaluated Petitioner over the course of three meetings with Petitioner - once at MTMHI and twice at Dr. Bernet's office - for a total of about four hours. *Id*. at 133, 140. Dr. Bernet performed psychological testing on Petitioner, including two tests dealing with malingering, and arranged for others to perform neuropsychological and genetic testing on him. *Id*. at 133-34. From interviewing Petitioner and his parents, Dr. Bernet identified several psychosocial stressors in Petitioner's life, including the following: Petitioner's conflict and competition with foster children; conflict with his stepsister and her family who had moved into his house, causing him to sleep on either the living room floor or in his parents' bedroom; conflict with the victim bus driver; the deaths of a teammate, his grandmother, and his dog; two classmates who survived suicide attempts; Petitioner's stomach ulcer; Petitioner's father was medically disabled; and Petitioner's older brother was deployed to Iraq. *Id*. at 135-39. Dr. Bernet stated that it was "really unusual" for a 14-year-old child to have to confront so many things. *Id*. at 138-39. According to Dr. Bernet, Petitioner's parents stated that Petitioner was generally compliant

---

[8]Dr. Currey testified that he refrains from asking patients if they feel remorse or contrition for something they have done. (Docket Entry No. 83, at 112). Dr. Currey initially stated that he thought that he mentioned in his report that Petitioner exhibited a sense of guilt, but Dr. Currey could not find where he may have made this alleged observation in his 2005 report. *Id*. at 113. Dr. Currey admitted that he could not "recall if Petitioner ever said anything to [him] specifically about feeling guilty." *Id*. Dr. Currey stated that if a patient spontaneously self-disclosed that he or she felt terrible about something that he or she had done Dr. Currey would note that. *Id*. at 117.

with rules and did what they asked of him, but noticed that his demeanor changed a few months prior after Petitioner's stepsister and her family moved into their house.  *Id*. at 135.  Petitioner's parents described Petitioner "as being somewhat depressed," that he was not "as talkative and as outgoing as in the past," and that "he seemed grumpy at times."  *Id*. at 137.

Like Dr. Currey, Dr. Bernet diagnosed Petitioner with major depressive disorder, recurrent, severe, with psychotic features.  *Id*. at 142; Plaintiff's Collective Ex. A, at P31.  However, unlike Dr. Currey, Dr. Bernet additionally diagnosed Petitioner with intermittent explosive disorder and attention deficit/hyperactivity disorder.  *Id*. at 145, 161; Plaintiff's Collective Ex. A, at P31.  As with Dr. Currey, Petitioner reported troubled sleeping, suicidal thoughts, and outbursts of anger that caused him to have memory lapses.  *Id*. at 143-45.  Dr. Bernet made a secondary diagnosis of intermittent explosive disorder based upon Petitioner getting into fights impulsively over trivial matters and blacking out during the course of the fight.  *Id*. at 145.  Dr. Bernet believed that Petitioner "was probably typical of the group of boys who get into fights," but thought that "the nature of the fights were somewhat unusual because of . . . what he described as blacking out."  *Id*. at 146.

Petitioner told Dr. Bernet that he did not remember shooting his bus driver, but Dr. Bernet believed that Petitioner just did not want to talk about what had happened.  *Id*. at 148-49.  While Dr. Bernet believed that Petitioner may have exaggerated some things, psychological tests indicated that Petitioner was not malingering.  *Id.* at 150-51.  Petitioner also reported hearing intermittent voices telling him to kill himself or to hurt others and that he heard a voice telling him to kill the victim.  *Id*. at 151-52.  Dr. Bernet characterized the hearing of voices as features of depression, but that Petitioner was not psychotic.  *Id*. at 152.  Genetic testing revealed that Petitioner had a predisposition

for depression, but not violence. *Id*. at 156-57, 199. This genetic predisposition showed that Petitioner was therefore biologically more vulnerable to stress than a typical person. *Id*. at 190.

Dr. Bernet testified that facilities were available through DCS to provide rehabilitative services for Petitioner. *Id*. at 167-68. Dr. Bernet opined with a reasonable degree of medical certainty that Petitioner could overcome his depression with treatment. *Id*. at 168-69. Dr. Bernet testified that depression "is probably the most treatable" psychiatric illness. *Id*. at 169. Dr. Bernet also opined with a reasonable degree of medical certainty that Petitioner could get control of the intermittent explosive disorder with treatment as he believed that Petitioner had a mild version of intermittent explosive disorder that was manifested by only a few fistfights. *Id*. at 170. As for future dangerousness, Dr. Bernert opined that the risk of Petitioner acting in a seriously violent and harmful manner was "very, very low," as Petitioner lacked many important risk factors. *Id*. at 170-71; Plaintiff's Collective Ex. A, at P36. The factors that Dr. Bernet cited were that Petitioner was not in a gang; he did not have a prior record of delinquency; he did not have a history of chronic, recent, and frequent violence; he did not have substance abuse that was involved with the violent behavior; his family was not a violent family; he did not have maladaptive personality traits such as a lack of empathy; he was not physically or sexually abused; and he did not have the gene that has been associated with violence. *Id*. at 171-72; Plaintiff's Collective Ex. A, at P36. Dr. Bernet noted in his report that the most serious external stressors that contributed to Petitioner's violent behavior had resolved themselves as Petitioner's parents stopped taking in foster children and Petitioner's stepsister and her family had moved out of Petitioner's house. Plaintiff's Collective Ex. A, at P36.

As to the statement that "violent behavior in the past is the best predictor of violence," Dr. Bernet described it as a "general statement" that is "probably . . . true some of the time" for certain

15

type of offenses, but believed that Petitioner's action was the type of a single, out-of-character action that would not trigger this adage. (Docket Entry No. 83, at 173). Dr. Bernet opined that, with medication and psychotherapy, Petitioner's depression could be rehabilitated as quickly as in a few weeks to months, with continued treatment for a period of time to make sure his improvement remained stable. *Id*. at 193.

### F. Testimony of Dr. Kimberly Stalford

Dr. Kimberly Stalford, a general psychiatrist, testified for the State. *Id*. at 213. Dr. Stalford has treated children, along with adults, but is not a child psychiatrist. *Id*. at 214. Dr. Stalford was unable to diagnose Petitioner because she did not interview him at the time of the original transfer hearing, but based upon her review of various documents, including Petitioner's medical records, and the surrounding facts, she had "serious doubts about the diagnosis of major depressive disorder, recurrent, severe with psychotic features." *Id*. at 221-23. Dr. Stalford believed that "the records supported more of a diagnosis of depressive disorder NOS or not otherwise specified." *Id*. at 223.

Dr. Stalford testified that based upon the reports that she read she was confused about Petitioner's alcohol use as the history was inconsistent on alcohol use. *Id*. at 226. However, Dr. Stalford stated that there was no evidence in the record that Petitioner had been drinking on the morning of March 2, 2005. *Id*. at 227.

Dr. Stalford opined that in reviewing the records she did not believe that Petitioner met the criteria for major depressive disorder based upon the objective observations reported in the MTMHI records. *Id*. at 228. Dr. Stalford explained that Petitioner ate and slept well, he interacted with others

well, and he was consistently described as displaying positive affect and mood. *Id*. at 228-31.[9] Dr. Stalford noted that Petitioner's medical records showed that he had gastritis, not a stomach ulcer, which was treated with antibiotics. *Id*. at 234-35. According to Dr. Stalford, Petitioner did not display psychomotor retardation or agitation or exhibit any problems in concentrating. *Id*. at 235-36. Dr. Stalford stated that there was nothing in the record that showed that Petitioner had any previous suicidal behaviors, such as there were "no previous suicide attempts, no history of cutting, [and] no history of overdosing." *Id*. at 237. Dr. Stalford also stated that although Petitioner reported experiencing hallucinations, there was no objective evidence in the record showing that Petitioner suffered from any auditory or visual hallucinations. *Id*. at 237-39, 270-71.

Dr. Stalford did not believe that Petitioner's records supported Dr. Bernet's diagnosis of intermittent explosive disorder. *Id*. at 239-41. Dr. Stalford testified that to correlate one gene to depression was "a little simplistic" and that "for every study that did show that there was some connection to depression, there have been some that showed it was not." *Id*. at 242. Dr. Stalford testified that she could not say with any certainty that "there's a test or a gene that . . . [shows] that's

---

[9]At the 2005 transfer hearing, Dr. Stalford testified that she believed that nursing notes were extremely valuable because they were spending the most time with patients and documenting behavior. (Docket Entry No. 65-1, at pp. 121, 135, 155-56). At the April 2019 transfer hearing, Dr. Stalford testified that psychiatric technicians were assigned to Petitioner for 24 hours a day and that their job was to monitor safety and also to monitor sleep. (Docket Entry No. 83, at 228). Dr. Stalford testified that nurses are very important to the team because they work 12-hour shifts and provide extensive monitoring of patients and that nurses are trained to make accurate observations. *Id*. at 229-30, 240. Dr. Stalford acknowledged that she did not know the physical layout of MTMHI or see the nurses working there, but she testified that she spoke to Kim Rush, the director of the adolescent unit at MTMHI, who answered her questions about the behavioral technicians or the persons that were sitting with Petitioner, such as whether they were at arm's length all of the time; did they observe sleep and appetite; did they coordinate with the nurses; and whether the nurses were involved in assessing mood and affect, appetite, behavior, and psychomotor retardation. *Id*. at 257-58.

what causes depression." *Id.* Dr. Stalford testified that for people who have recurrent episodes of depression the relapse rate of having another episode is between 60 and 80 percent. *Id.* at 242-43. Dr. Stalford opined that the results from Petitioner's psychological testing relied upon by Dr. Currey and Dr. Bernet were confusing and did not indicate major depressive disorder. *Id.* at 244-45, 250; Defendant's Ex. 1, at p. 23. Dr. Stalford testified that at the time of the 2005 transfer hearing she did not see any evidence in the record of a major depressive disorder with psychosis and that she did not see anything about contrition or sadness from Petitioner regarding the victim or her family. *Id.* at 266-68, 277. Dr. Stalford admitted that there were no statements in the record where someone specifically asked Petitioner how he felt about what he had done. *Id.* at 283.

Dr. Stalford disagreed with Dr. Currey and Dr. Bernet and opined that Petitioner's history of violence could be a predictor of future violence, and "perhaps the best predictor," particularly the type of violence involved here, the murdering of Gregory. *Id.* at 248-49. Based on her review of the records, Dr. Stalford opined that Petitioner was experiencing some degree of depression and exhibiting some signs of possible antisocial personality disorder. *Id.* at 250-51; Defendant's Ex. 1, at p. 23.[10] Dr. Stalford was also concerned that Petitioner may have been malingering. *Id.* at 251. Dr. Stalford testified that it was "challenging" to successfully treat depression. *Id.* at 249-50.

### G. Testimony of Judge Andrew Brigham

Andrew Brigham, General Sessions and Juvenile Court Judge in Stewart County, Tennessee, was allowed to testify. Upon objection by Petitioner, the Magistrate Judge struck Judge Brigham's

---

[10]Dr. Stalford explained that while a person cannot be diagnosed with antisocial personality disorder before the age of 18, if a person shot and killed someone she would definitely monitor that person for other related antisocial symptoms in assessing treatment. (Docket Entry No. 83, at 247, 279, 282, 293-95).

testimony, and the testimony thereby has not been considered by the Magistrate Judge. (Docket Entry No. 84, at 44, 46).[11]

## IV. CONCLUSIONS OF LAW

As previously determined, the Magistrate Judge will apply the version of Tenn. Code Ann. § 37-1-134 that was in effect at the time of the August 2, 2005 transfer hearing. (Docket Entry No. 71).[12] That statute provides the circumstances in which juvenile courts shall transfer a juvenile, charged with a delinquency based on conduct that is designated a crime or public offense under the laws of Tennessee, to be dealt with as an adult in a criminal court of competent jurisdiction. Tenn. Code Ann. § 37-1-134(a) (2005). The disposition of the child shall be as if the child were an adult if the child is less than sixteen years old and charged with a certain offense, such as first degree murder, and the juvenile court finds that there are "reasonable grounds"[13] to believe (A) that the "child committed the delinquent act as alleged;" (B) that the "child is not committable to an institution for the developmentally disabled or mentally ill;" and (C) that the "interests of the community require that the child be put under legal restraint or discipline." *Id.*, § 37-1-134(a)(1),

---

[11]The Magistrate Judge previously deferred ruling on whether to consider Judge Brigham's testimony, stating, "Any ruling considering Judge Brigham will be deferred until the conclusion of the hearing. I am inclined to consider it given the unique status of the case and the fact that he was precluded from ruling by the waiver of the hearing by Petitioner." (Docket Entry No. 81).

[12]The parties agreed that the version of Tenn. Code Ann. § 37-1-134 in effect on August 2, 2005, governs this action (Docket Entry No. 65, at 6; Docket Entry No. 69, at 2), and the Magistrate Judge noted that the later changes to that statute were to form and language and not to substance (Docket Entry No. 71).

[13]The term "reasonable grounds" has been used interchangeably with "probable cause" by Tennessee courts. *State v. Reed*, No. M2009-00887-CCA-R3CD, 2010 WL 3432663, at *10, 6 (Tenn. Crim. App. Aug. 31, 2010); *State v. Eckert*, No. E201701635CCAR3CD, 2018 WL 3583308, at *4 (Tenn. Crim. App. July 25, 2018), *appeal denied* (Oct. 10, 2018).

(4)(A)-(C).  In determining whether to treat a juvenile as an adult, the court must consider, "among other matters," the following:

> (1) The extent and nature of the child's prior delinquency records;
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
> (4) Whether the offense was committed in an aggressive and premeditated manner;
> (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and
> (6) Whether the child's conduct would be a criminal gang offense . . if committed by an adult.

*Id.*, 37-1-134(b).  This list is not exclusive.  *State v. McGill*, No. M2013-01076-CCA-R3CD, 2014 WL 1413875, at *7 (Tenn. Crim. App. Apr. 11, 2014) ("As this Court previously has recognized, the list of specifically enumerated factors set forth in subsection (b) of the transfer statute 'is by no means exclusive.'") (citation omitted).  "[T]here is no requirement that all considerations be present." *State v. Wilson*, No. W2003-02394-CCA-R3CD, 2004 WL 2533834, at *2 (Tenn. Crim. App. Nov. 8, 2004).  "Transfer is mandatory if the three elements set out in § 37-1-134(a)(4) are satisfied." *Clinard*, 722 F. App'x at 555.  Regardless of the seriousness of the offense, any child is released from a juvenile court's jurisdiction upon the child's nineteenth birthday.  *Id.*; Tenn. Code Ann. § 37-1-103(c) (2005).

As to the first two criteria set forth in Tenn. Code Ann. § 37-1-134(a)(4)(A)-(B), whether there are reasonable grounds to believe that (1) the "child committed the delinquent act as alleged," and (2) the "child is not committable to an institution for the developmentally disabled or mentally ill," the evidence supports, and Petitioner concedes that the State has met its burden in proving these two criteria.  (Docket Entry No. 69, at 1).

In determining if the third criterion is met, whether there are reasonable grounds to believe that the "interests of the community require that the child be put under legal restraint or discipline," Tenn. Code Ann. § 37-1-134(a)(4)(C), a court must consider, "among other matters," the six factors set forth in Tenn. Code Ann. § 37-1-134(b). As to the first consideration, the extent and nature of Petitioner's prior delinquency records, Petitioner did not have any prior juvenile convictions or charges, which weighs in Petitioner's favor. Petitioner's disciplinary record is minimal. The Magistrate Judge does note that Petitioner was suspended from riding the bus for fighting a week before the murder, that Petitioner was twice given out-of-school suspension in the seventh grade for fighting, that one time Petitioner was given in-school suspension in the ninth grade for telling a teacher to shut up, and that Petitioner also got into fights with some of the foster children who would stay with his family. The Magistrate Judge also notes that Petitioner stated that he had a "short temper" and "tended to get angry easily." However, Drs. Currey and Bernet believed that Petitioner did not fight any more than other typical children at his school, but Dr. Bernet thought that the nature of the fights were unusual because Petitioner reported blacking out during them. Testimony from Petitioner's teachers and coach portrayed him as quiet and well-mannered and a good student and teammate.

Next, as to the nature of past treatment efforts and the nature of Petitioner's response thereto, Petitioner did not have a history of receiving mental health treatment or being diagnosed with depression. Petitioner asserts that because there is no history of him receiving mental health treatment then there is also no evidence that he "squandered any second chances or is incorrigible." (Docket Entry No. 86, at 20). The State argues that while, on the one hand, Petitioner's lack of previous treatment for his alleged severe depression and intermittent explosive disorder fails to show

whether he would be amendable to future treatment, on the other hand, this lack of prior treatment also weakens Petitioner's assertion that he suffered from these conditions so significantly that he was unable to control his impulses on March 2, 2005. (Docket Entry No. 85, at 12). Given the lack of evidence regarding past treatment history, the Magistrate Judge gives this factor neutral weight.

As to the third consideration, "whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person," here this factor weighs in favor of transfer as Petitioner committed an offense against a person, namely murder. *See State v. Polochak*, No. M2013-02712-CCA-R3CD, 2015 WL 226566, at \*38 (Tenn. Crim. App. Jan. 16, 2015) ("We note that greater weight in favor of transfer is given when the alleged offense is against a person."). Likewise, the fourth consideration, "whether the offense was committed in an aggressive and premeditated manner," weighs heavily in favor of transfer as the evidence supports a finding of probable cause that Petitioner committed the offense in an aggressive and premeditated manner. Petitioner asserts that "[t]here are strong reasons to believe the crime was not calculated, cold-blooded, or premeditated," arguing that Petitioner took the gun out of a suicidal impulse that turned outward when he saw the bus driver and he became angry again. (Docket Entry No. 86, at 21). However, the evidence shows that Petitioner had an ongoing hatred towards Gregory; that the day before the shooting Gregory had reported Petitioner to school officials for dipping snuff on the bus, resulting in Petitioner receiving an in-school suspension for the infraction; that Petitioner had almost a full day to reflect before committing the murder the next day; Petitioner went through his usual morning routine; loaded the handgun; purposefully, put on a large coat to conceal the weapon; insisted that his nephews first board the bus; that he fired all six bullets from the handgun; that he fled the scene; that he told Agent Craig that he liked living too much to kill himself; that he told

Agent Craig, "I hate her," and that he did not like Gregory's attitude and that she singled him out; and that he admitted that he knew beforehand that shooting Gregory was wrong and that he would be placed in jail as a result. The Magistrate Judge further notes that Petitioner, as a hunter, was familiar with guns and with the damage that they can inflict.[14] On balance, the Magistrate Judge concludes that the evidence supports a finding that the offense was committed in an aggressive and premeditated manner.

The fifth consideration pertains to the possible rehabilitation of Petitioner by the use of procedures, services and facilities currently available to the court in Tennessee. "In making a decision whether a juvenile is amenable to treatment or rehabilitation, the juvenile judge may consider many factors including testimony by expert witnesses, the type of facilities available, length of stay in these facilities, the seriousness of the alleged crime, and the attitude and demeanor of the juvenile." *State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975). A "juvenile court has wide discretion in the factors that it can consider when determining if an appellant is amenable to rehabilitation." *State v. Bell*, No. W2014-00504-CCA-R3CD, 2015 WL 1000172, at *4 (Tenn. Crim. App. Mar. 4, 2015) (citing *State v. Layne*, 546 S.W.2d 220, 224 (Tenn. Crim. App.1976) quoting *Strickland*, 532 S.W.2d at 920).

Here, the experts lacked consensus as to Petitioner's diagnoses, as Dr. Bernet diagnosed Petitioner with major depressive disorder, intermittent explosive disorder, and attention deficit hyperactivity disorder; Dr. Currey only diagnosed Petitioner with major depressive disorder; and Dr. Stalford opined based on her review of the records that Petitioner only suffered from depression, not

---

[14]Dr. Currey's report noted that Petitioner shot his first deer when he was twelve years old and that he went deer hunting almost every year. Plaintiff's Collective Ex. A, at P3.

severe and not otherwise specified.[15]  All agreed that substance abuse was not a factor.  Grasty,

Holliday and Howell testified that they never observed any signs of depressive or suicidal behavior

in Petitioner.  Dr. Stalford noted that there were no records of Petitioner exhibiting any previous

suicidal behaviors.  Dr. Currey explained that, in 2005, there were facilities available through the

DCS that could have provided counseling, treatment and medication for Petitioner.  Dr. Currey

testified that depression "is very treatable" and "requires treatment over a period of time" and

believed that Petitioner could be rehabilitated in the course of a couple of years if he received the

services available.  Dr. Currey believed that Petitioner posed a low risk of further violence.  Dr.

Bernet also testified that facilities were available through DCS to provide rehabilitative services for

Petitioner and opined that Petitioner could overcome his depression, as well as his intermittent

explosive disorder, with treatment.  Dr. Bernet opined that, with medication and psychotherapy,

Petitioner's depression could be rehabilitated as quickly as in a few weeks to months, with continued

treatment for a period of time to make sure his improvement remained stable.  As for future

dangerousness, Dr. Bernert testified that the risk of Petitioner acting in a seriously violent and

harmful manner was very low.  However, at the state transfer hearing Dr. Bernet acknowledged that

there could be no guaranty that treatment would be successful or that Petitioner would not reoffend,

particularly given that Petitioner was genetically predisposed to depression.  Dr. Stalford testified

that for people who have recurrent episodes of depression the relapse rate of having another episode

---

[15]Petitioner asserts that Dr.Stalford improperly gave great weight to the MTMHI nursing notes, citing testimony of Dr. Currey.  (Docket Entry No. 86, at 15).  The notes are what they are. The notes were made in the course of Petitioner's treatment at MTMHI and are part of the medical record.  Dr. Stalford was free to rely on these notes in making her assessment.  The Magistrate Judge has considered Petitioner's argument, along with the testimony of Dr. Currey and Dr. Stalford, in weighing the evidence.

is between 60 and 80 percent. Dr. Stalford testified that it was "challenging" to successfully treat depression.

On balance, the Magistrate Judge concludes that this factor, the "*possible* rehabilitation" of Petitioner by use of procedures, services and facilities available in Tennessee in 2005, weighs slightly in Petitioner's favor. While depression, according to the evidence, is treatable, the Magistrate Judge notes that Petitioner still has a genetic predisposition to depression and that there is a high rate of relapse for an episode of depression. The Magistrate Judge notes that stress is a normal occurrence in life, and that it remains unclear as to whether this depression, combined with other stressors, could lead to future violence.

As to the last consideration, whether Petitioner's conduct would be a criminal gang offense if committed by an adult, Petitioner's conduct was not gang related, and therefore this factor weighs in Petitioner's favor.

As to "other matters," the Magistrate Judge has considered that despite the violent nature of the offense committed the maximum time that Petitioner could have spent in a juvenile institution from the time of the shooting was approximately four years. This consideration weighs in favor of transfer.

Petitioner argues that the United States Supreme Court in *Roper v. Simmons*, 543 U.S. 551 (2005) made observations that "temper the perceived need to specifically deter a juvenile offender and to exact retribution because the juvenile is likely to grow out of his problems and is morally less responsible for his errors." (Docket Entry No. 86, at 23). Petitioner quotes:

> These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." . . . Their own vulnerability and comparative lack of control over their

immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. . . . The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. *From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.* Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside."

*Id*. (quoting *Roper*, 543 U.S. at 570) (citations omitted and emphasis added by Petitioner).

Petitioner's reliance on *Roper* is misplaced as *Roper* pertained to the prohibition against the death penalty to individuals who were less than 18 years old at the time of their capital crimes under the Eighth and Fourteenth Amendments. This argument is better suited for Petitioner's constitutional argument that is not before the Magistrate Judge.[16] In determining whether Petitioner should have been transferred to adult court, the Magistrate Judge has applied the factors set forth under Tennessee law and has considered Petitioner's age during this analysis.

Petitioner also argues that the Court may consider that Petitioner has already spent more than 14 years in custody. However, this Court is conducting a new transfer hearing on what it would have done based upon the facts and evidence that would have been before it on August 2, 2005. Thus, consideration of the time Petitioner has already served is not appropriate.

The Magistrate Judge has considered the evidence submitted at both transfer hearings and all of the arguments of the parties in weighing the factors discussed under Tennessee law. Based upon the evidence in the record, the Magistrate Judge concludes that there are reasonable grounds

---

[16]Although the issue is not before the Magistrate Judge, the Magistrate Judge notes that in a recent opinion, the Sixth Circuit held that a petitioner's 51-year sentence for a crime he committed as a juvenile did not violate the Eighth Amendment. *Atkins v. Crowell*, 945 F.3d 476 (6th Cir. 2019).

to believe that the "interests of the community require that the child be put under legal restraint or discipline," and therefore the evidence supports transfer to adult court. While there is evidence of possible rehabilitation, there was also evidence that Petitioner's depression could relapse and there were no guarantees that Petitioner would not reoffend. Petitioner could only be under supervision until his nineteenth birthday. Further, and most importantly, Petitioner committed the most serious offense, taking the life of another person, and the evidence discussed previously supports that the offense was carried out it in an aggressive and premeditated manner. *See State v. Sexton*, No. E200001779CCAR3CD, 2002 WL 1787946, at *8 (Tenn. Crim. App. Aug. 2, 2002) (affirming transfer of 15 year old juvenile who committed the "most serious crime" of murder); *State v. McGill*, No. M2013-01076-CCA-R3CD, 2014 WL 1413875, at *7 (Tenn. Crim. App. Apr. 11, 2014) ("Common sense dictates that a juvenile who commits crimes in a premeditated manner may put a community at risk even if the crime was not committed in an aggressive manner.").

The Magistrate Judge notes the tragic nature of this case. It is tragic that Joyce Gregory's life was taken away from her and that she was taken away from her family, friends and loved ones. It is tragic that Jason Clinard, who was described as quiet and well-mannered and as a good student and teammate, committed such a terrible act. Here, the issue before the Magistrate Judge is whether based upon the evidence in 2005 should the state juvenile court have granted a transfer to adult court. Although the Magistrate Judge's decision may lead to a harsh result, an effective sentence of 51 years before being eligible for parole, there exist possible remedies such as executive

clemency,[17] Tenn. Code Ann. § 40-27-101, for post-conviction rehabilitative conduct, among other reasons, or through possible, subsequent legislative changes by the General Assembly.[18]

## V. RECOMMENDATION

Accordingly, for these reasons, the Magistrate Judge **RECOMMENDS** that based upon the evidence at the time of the August 2, 2005 transfer hearing the state court should have transferred Petitioner to be dealt with as an adult in the criminal court of competent jurisdiction.

The parties have fourteen (14) days after being served with a copy of this Report and Recommendation ("R&R") to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

**ENTERED** this 28th day of January, 2020.


/s/      Joe  B.  Brown
JOE B. BROWN
United States Magistrate Judge

---

[17]See https://www.nytimes.com/2019/01/07/us/cyntoia-brown-clemency-granted.html

[18]See Notice (Docket Entry No. 72) and attachments thereto.