UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JASON CLINARD,                    )
                                  )
            Petitioner,           )
                                  )        No. 3:13-cv-01190
v.                                )
                                  )
RANDY LEE, Warden,                )
                                  )
            Respondent.           )

## MEMORANDUM OPINION

On February 27, 2018, the Sixth Circuit Court of Appeals reversed this Court's denial of Petitioner Jason Clinard's petition for a writ of habeas corpus and, having found prejudice resulting from Clinard's juvenile court counsel's ineffective assistance, remanded the case for the Court to conduct a *de novo* hearing on the question of whether Clinard's case should be transferred to adult court. Clinard v. Lee, 722 F. App'x 552, 565-66 (6th Cir. 2018), cert. denied, 139 S. Ct. 123 (2018). In anticipation of that hearing, Clinard filed a motion to dismiss the transfer petition challenging the constitutionality of the sentence he would face if transferred to adult court and convicted of first-degree murder. (Doc. No. 104). The State opposed Clinard's motion.

Magistrate Judge Joe Brown conducted the *de novo* transfer hearing in April 2019 and recommended granting the transfer (Doc. No. 88), but Judge Brown did not consider Clinard's motion to dismiss. The Court found that the issues raised in the motion to dismiss and the transfer petition were inextricably intertwined and, on that basis, vacated Judge Brown's report and recommendation and ordered a new hearing at which the parties could offer additional evidence or testimony regarding the motion to dismiss. (Doc. No. 111). In the interim, the Tennessee Supreme Court granted an application for permission to appeal in State v. Booker, in which Tyshon

1

Booker argued that the life sentence he faced as a juvenile offender convicted of first-degree murder under Tennessee law was unconstitutional. Recognizing the importance of that decision to the issues raised in Clinard's motion to dismiss and the transfer petition, the Court stayed these proceedings pending the Tennessee Supreme Court's decision. On November 18, 2022, the Tennessee Supreme Court held as a matter of first impression "that an automatic life sentence when imposed on a juvenile homicide offender with no consideration of the juvenile's age or other circumstances violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution. State v. Booker, 656 S.W.3d 49, 52 (Tenn. 2022).

The Court reopened this case, and Magistrate Judge Alistair Newbern held the second *de novo* transfer hearing on April 19, 2023.[1] The parties elected to adopt the testimony given and evidence presented in the April 2019 transfer hearing, and Clinard testified on his own behalf. The parties have filed briefing on the effect of the Booker decision on these proceedings and post-hearing briefs addressing the testimony offered and questions raised in the April 19, 2023 hearing. (Doc. Nos. 144, 145, 152). Clinard's motion to dismiss and the transfer petition are now ripe for review.

## I.      PROCEDURAL HISTORY

In March 2005, Jason Clinard was charged with the first-degree murder of Joyce Gregory in the Juvenile Court of Stewart County, Tennessee. Clinard v. Lee, 722 F. App'x 552, 555 (6th Cir. 2018), cert. denied, 139 S. Ct. 123 (2018). At the time of the offense, Clinard was 14 years old.

After his arrest, Clinard was placed in the Middle Tennessee Mental Health Institute ("MTMHI"). Id. The court appointed public defender Jake Lockert—an attorney with substantial

---

[1] Magistrate Judge Brown retired from service on February 26, 2020. (See Doc. No. 95).

experience as a prosecutor and criminal defense lawyer, including in murder trials and juvenile-court proceedings—to represent Clinard. Id. Because Lockert anticipated that the State would seek to prosecute Clinard as an adult, Lockett and his staff began to prepare for a transfer hearing. Id. Lockert retained Dr. William Bernet, Director of Forensic Psychiatry at Vanderbilt University, to conduct a forensic psychiatric evaluation of Clinard. Id. Lockert also spoke with two doctors treating Clinard at MTMHI as well as administrators from that facility. Lockert believed these individuals would testify that Clinard had "no prior criminal behavior," "was a model student involved in extracurricular activities," and "had shown signs of extreme honesty." Id. (citing Doc. No. 33, Ex. 3 at PageID# 396). Lockert and his staff spent approximately 300 hours working on Clinard's case, and his case file totaled "somewhere between six hundred and a thousand pages." Id. at 555-56.

As expected, the State moved to transfer Clinard's case to adult court. However, before the transfer hearing took place, Clinard's family retained Worth Lovett as counsel, and Lockert withdrew from representation. Id. at 556. Lovett had considerably less relevant criminal defense experience than Lockert and had not tried any murder cases. Id. Lockert spoke to Lovett about the witnesses Lockert had secured to testify at the transfer hearing and emphasized the importance of having neutral MTHMI doctors testify that Clinard could complete a treatment program by age 19. Id. Lovett did not request Clinard's case file or seek any further assistance from Lockert. Id.

Stewart County Juvenile Court Judge Andrew Brigham conducted Clinard's transfer hearing on August 2, 2005. Id. at 553, 555-56. The parties stipulated to the admission of a court-ordered psychiatric evaluation of Clinard prepared by MTMHI psychologist Dr. M. Duncan Currey. Id. at 556. Clinard then called Dr. Bernet to testify out of order. After two witnesses for the state testified, Lovett requested an in-chambers conference. Id. at 556-57. In that conference,

Lovett recommended to Clinard that he agree to the transfer. Id. at 557. Clinard followed Lovett's advice and consented to be tried in adult court. The parties drafted an agreed order stating that the elements of the transfer statute had been satisfied. Judge Brigham entered the parties' order, thus transferring Clinard to the jurisdiction of the Stewart County Circuit Court. Id.

After trial in the Circuit Court, a jury convicted Clinard of first-degree premeditated murder. State v. Clinard, No. M2007-00406-CCA-R3CD, 2008 WL 4170272, at *1 (Tenn. Crim. App. Sept. 9, 2008). Because the State did not seek a sentence of life imprisonment without the possibility of parole, Clinard "received the statutorily mandated sentence of life imprisonment." Id. at *2. On direct appeal, the Tennessee Court of Criminal Appeals affirmed Clinard's conviction and sentence. Id. at *2-7. Clinard did not seek further review of that decision. Id. at *1.

On January 29, 2009, Clinard filed a state post-conviction petition on his own behalf. Clinard v. State, No. M2011-1927-CCA-R3-PC, 2012 WL 6570893, at *2 (Tenn. Crim. App. Dec. 17, 2012). The trial court conducted an evidentiary hearing at which Judge Brigham testified that he was surprised by Clinard's decision to agree to the transfer "because the state had not rested," and "[t]he defense hadn't started yet other than that out-of-order witness [Dr. Bernet]." Clinard v. Lee, 722 F. App'x 552, 557 (quoting Postconviction Hr'g, R. 33-3, PID# 438-39). "The only explanation Judge Brigham could recall for the decision was that 'the defense was concerned that the record was developing against their client,' and that the record of the transfer hearing might be used against Clinard at trial or by the corrections department." Id. (quoting Postconviction Hr'g, R. 33-3, PID# 439, 459). Judge Brigham testified that he "was going to consider possible rehabilitation programs available to [Clinard] in juvenile court, [Clinard's] amenability to rehabilitation, and evidence showing the existence of premeditation." Id. at *3. The post-conviction court found that, although Lovett's performance was deficient for failing to present

4

available testimony regarding Clinard's mental health and potential for rehabilitation, Clinard was not prejudiced by the deficient representation because "there was no reasonable probability that [Clinard] would not have been transferred to adult court had all of the evidence been presented to the juvenile court." Id. at *4. The Tennessee Court of Criminal Appeals affirmed, finding that Clinard had "failed to establish that but for counsel's deficient performance, his case would not have been transferred from juvenile to adult court." Id. at *9.[2]

On October 28, 2013, Clinard filed a pro se petition for a writ of habeas corpus in this Court. (Doc. No. 1). The Court appointed counsel (Doc. No. 16), and counsel filed an amended petition on May 2, 2016. (Doc. No. 30). The Court denied relief, finding that, while it was not unreasonable for the state courts to have find that Lovett performed deficiently at the transfer hearing, Clinard had not established prejudice. (Id.) The Court granted a Certificate of Appealability on Clinard's ineffective assistance of counsel claim. (Doc. No. 46).

The Sixth Circuit reversed, finding "no reasonable argument that Clinard was not prejudiced by his counsel's deficient performance." Clinard, 722 F. App'x at 565. The court held that, "[b]ecause there is a reasonable probability that Clinard would not have been transferred to adult court absent his counsel's ineffective assistance," Clinard was "entitled to a new transfer hearing." Id. at 566.

## II.    GOVERNING LAW ON REMAND

The Sixth Circuit instructed that the appropriate redress for the ineffective representation Clinard received at his August 2005 transfer hearing is to afford Clinard a "new" transfer hearing

---

[2] While his post-conviction proceedings were on appeal, Clinard filed a pro se petition for state habeas corpus relief. Clinard v. State of Tenn., No. M2012-00839-CCA-R3-HC, 2012 WL 4459717, at *1-2 (Tenn. Crim. App. Sept. 27, 2012), perm. app. denied (Feb. 15, 2013). The trial court summarily dismissed the petition, and the Tennessee Court of Criminal Appeals affirmed the dismissal. Id. The Tennessee Supreme Court denied Clinard's application for permission to appeal the denial of post-conviction and habeas relief. Clinard, 2012 WL 6570893, perm. app. denied (May 8, 2013).

in this Court. <u>Clinard v. Lee</u>, 722 F. App'x 552, 566 (6th Cir. 2018). The Court previously determined that, to provide this relief, it "must operate under the legal fiction that no previous proceedings have occurred—neither the 2005 juvenile transfer hearing nor [Clinard's] previous federal habeas corpus proceedings." (Doc. No. 101 at PageID# 5861). Clinard's constitutional remedy is, in effect, a procedural blank slate. <u>See</u> <u>Green v. Reynolds</u>, 57 F.3d 956, 960 (10th Cir. 1995) (holding that *de novo* juvenile transfer hearing "was not, properly speaking, a continuation of the post-conviction proceeding . . . but the <u>constitutional remedy</u> for a . . . violation <u>already found</u>") (emphasis in original).

The legal standards under which the Court operates in this *de novo* proceeding, however, are not similarly rewound to those in place in 2005. In the eighteen years that have elapsed since Clinard's first hearing, the United States Supreme Court has announced multiple new substantive rules of constitutional law that directly address the Eighth Amendment rights of juvenile defendants convicted of homicide. The Court must address the effect of this developing doctrine on Clinard's claims.

The line of relevant decisions begins with <u>Thompson v. Oklahoma</u>, 487 U.S. 815 (1987), in which the Supreme Court held that the Eighth Amendment's proscription of cruel and unusual punishment prevented the execution of a person who was under the age of 16 at the time of his or her offense. <u>Id.</u> at 835. The Court noted that it already had "endorsed the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult." <u>Id.</u> "The basis for this conclusion," the Court wrote, "is too obvious to require extended explanation." <u>Id.</u>

In <u>Roper v. Simmons</u>, 543 U.S. 551 (2005), the Court held that "evolving standards of decency" and a recognition that, "[f]rom a moral standpoint it would be misguided to equate the

failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed", proscribed capital punishment for any offender under the age of eighteen. Id. at 570. The Court recognized that the lessened culpability of juvenile offenders stems from a lack of maturity, an underdeveloped sense of responsibility, greater vulnerability and susceptibility "to negative influences and outside pressures," and undeveloped character. Id. (internal quotations omitted). Thus, a single impetuous crime by a juvenile—even a heinous crime—does not render the juvenile necessarily irredeemable in the eyes of the law as it might an adult; rather, a "greater possibility exists that a minor's character deficiencies will be reformed" since the "signature qualities of youth . . . can subside." Id. at 569-70.

These holdings were in place at the time of Clinard's first transfer hearing. In subsequent years, the Supreme Court applied the principles identified in Thompson and Roper in considering other punishments imposed on juvenile offenders.

In 2010, the Supreme Court held in Graham v. Florida, 560 U.S. 48 (2010), that a sentence of life imprisonment without the possibility of parole for juvenile offenders convicted of offenses other than homicide violated the Eighth Amendment. Id. at 75. The Court held that such a sentence imposed on a less-culpable juvenile offender would not serve legitimate penological purposes and, instead, "'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.'" Id. at 70 (alteration in original) (quoting Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 944 (1989)). The Court held that "the juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential" but should be given "a chance to demonstrate maturity and reform"

that "can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation." Id. at 79.

Two years later, the Supreme Court extended Graham's holding to announce that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile homicide offenders." Miller v. Alabama, 567 U.S. 460, 479 (2012). Four years after that, the Supreme Court held that Miller applied retroactively to cases on collateral review. Montgomery v. Louisiana, 577 U.S. 190, 208-09 (2016). In 2021, the Supreme Court held that Miller and Montgomery did not require a factual finding of permanent incorrigibility before a juvenile offender could be sentenced to life without parole and that "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." Jones v. Mississippi, 141 S. Ct. 1307, 1313 (2021).

The Tennessee Supreme Court applied this line of precedent in its Booker decision to hold that the automatic imposition of a life sentence under Tennessee law on a juvenile defendant convicted of first-degree murder without consideration of the juvenile's age or other circumstances violated the Eighth Amendment. Booker 656 S.W.3d at 52. The Court announced that, for those juvenile offenders who had received life sentences without individualized consideration of their circumstances, the remedy was to make those offenders subject to a release eligibility provision enacted by the Tennessee General Assembly in a different context. Id. at 66-68 (addressing Tenn. Code Ann. § 40-35-501(h)(1)). Under that provision, a defendant convicted of first-degree murder becomes eligible for parole consideration after serving sixty percent of his sentence. Id. The Court held that applying this release eligibility provision "complies with Montgomery, which allows states to remedy a Miller violation by allowing juvenile homicide offenders to receive an individualized parole hearing rather than be resentenced." Id. at 68 (citing Montgomery, 577 U.S.

at 212). The <u>Booker</u> Court also addressed the retroactive application of its holding, finding that it "directly affect[ed] . . . over 100 other juvenile homicide offenders who are or will be incarcerated in Tennessee prisons under an unconstitutional sentencing scheme." <u>Id.</u> at 67. Clinard is one of the offenders to whom the Tennessee Department of Correction has applied <u>Booker</u>'s holding. Clinard's parole eligibility date is now December 26, 2033. (Doc. No. 123-1 at PageID# 6010).

It is well-established that "[n]ew constitutional rules announced by [the United States Supreme Court] that place certain kinds of primary individual conduct beyond the power of the States to proscribe, as well as 'watershed' rules of criminal procedure, must be applied in all future trials, all cases pending on direct review, and all federal habeas corpus proceedings." <u>Danforth v. Minnesota</u>, 552 U.S. 264, 266 (2008) (summarizing the <u>Teague</u> rule described in Justice O'Connor's plurality opinion in <u>Teague v. Lane</u>, 489 U.S. 288 (1989)). "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." <u>Griffith v. Kentucky</u>, 479 U.S. 314, 328 (1987). Importantly, "the source of a 'new rule' is the Constitution itself, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists [the Court's] articulation of the new rule." <u>Danforth</u>, 552 U.S. at 271; <u>see also</u> <u>Am. Trucking Ass'ns, Inc. v. Smith</u>, 496 U.S. 167, 201 (1990) ("Since the Constitution does not change from year to year; since it does not conform to our decisions, but our decisions are supposed to conform to it; . . . [e]ither enforcement of the statute at issue . . . was unconstitutional, or it was not . . . whether occurring before or after our decision . . . .") (Scalia, J., concurring).

The Sixth Circuit's direction to provide Clinard a "new" juvenile transfer hearing puts his case on the same procedural footing as one that is pending on direct review or not yet final. (Doc.

9

No. 101, PageID# 5861). An imperfect but helpful procedural analogy is found in decisions addressing the application of the new constitutional rules announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), and United States v. Booker, 543 U.S. 220 (2005), when a defendant originally sentenced before those cases were decided is resentenced pursuant to the First Step Act of 2018. In United States v. Ware, the Sixth Circuit held that, although Apprendi does not apply retroactively, the Constitutional source of that decision's holding meant that "'the underlying right necessarily pre-exists [the Supreme Court's] articulation of the new rule.'" 964 F.3d 482, 488 (6th Cir. 2020) (quoting Danforth, 552 U.S. at 271). Thus, the defendant's "Sixth Amendment rights were violated when judge-found facts were used to raise his statutory maximum sentence, even though this occurred before Apprendi was decided." Id. The court held that, "for a defendant . . . who was sentenced before Apprendi, consideration of the impact that Apprendi would have had on his statutory sentencing range is a factor that the district court may consider when deciding whether, in its discretion, to grant relief to a defendant whom Congress has made eligible for relief." Id. (citing United States v. Allen, 956 F.3d 355, 357 (6th Cir. 2020) for the proposition that "a 'district court . . . err[s] as a matter of law' if it restricts itself to consideration of 'the law and facts as they existed at the time of [the defendant's] original sentencing'").

As in these cases, nothing in the Supreme Court's retroactivity jurisprudence requires this Court to "perpetuate the application of an unconstitutional practice" by ignoring the new rules announced in the Graham, Miller, Montgomery, and Booker decisions in considering Clinard's motion and petition. United States v. Stone, No. 1:96 CR 403, 2019 WL 2475750, at *2 (N.D. Ohio June 13, 2019) (collecting cases affirming this principle). To the contrary, it would be error for the Court to ignore the substantial development in this area of law that has taken place since

Clinard's original transfer hearing. The rights articulated in those decisions far predate their announcement and any aspect of these proceedings.

Therefore, the Court will consider those relevant decisions that have been made retroactive in considering Clinard's motion to dismiss and the transfer petition.

## III.    CLINARD'S MOTION TO DISMISS THE TRANSFER PETITION

Clinard moves to dismiss the petition to transfer him to adult court "because that transfer would subject him, if convicted of the pending charge of first-degree murder, to the mandatory imposition of an unconstitutional punishment, namely, imprisonment for life or for life without parole." (Doc. No. 104). Under Tennessee law at the time of Clinard's offense, "[a] person convicted of first degree murder shall be punished by: (1) Death; (2) Imprisonment for life without possibility of parole; or (3) Imprisonment for life." Tenn. Code Ann. § 39-13-202(c)(1) (1995). A death sentence could only be imposed if the person was an adult at the time of the offense. Tenn. Code Ann. § 39-13-202(c)(2) (1995). Thus, if Clinard were convicted of first-degree murder in adult court, he would face an automatic sentence of life without parole or life imprisonment. A person sentenced to life imprisonment under Tennessee law must "serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained," but such credits shall not "operate to reduce the sentence imposed by the court by more than fifteen percent (15%)." Tenn. Code Ann § 40-35-501(i). Thus, a life sentence requires that the offender serve at least fifty-one years.

Clinard bases his argument for dismissal on the reasoning of Roper, Miller, and Montgomery that juvenile offenders must be given the opportunity to demonstrate rehabilitation in maturity. Clinard argues that, following this principle, a sentence that requires a juvenile offender to spend more than fifty years in custody without the possibility of release, as Tennessee's life sentence does, runs afoul of the Eighth Amendment. See Brown v. Jordan, 563 S.W.3d 196,

11

202 (Tenn. 2018) (holding that life sentence under Tennessee law is sixty years and that a defendant convicted of a first-degree murder occurring after July 1, 1995, "may be released after service of at least fifty-one years if the defendant earns the maximum allowable sentence reduction credits"). Before the Court addresses the merits of Clinard's motion, it must first determine whether it is able to consider the motion at all in its current posture as the Stewart County Juvenile Court sitting before Clinard's case was transferred to adult court.

### A.    Standing and Ripeness

"As an initial matter, '[a] constitutional challenge to a sentence is a question of law and reviewed *de novo*.'" United States v. Moore, 643 F.3d 451, 454 (6th Cir. 2011) (quoting United States v. Jones, 569 F.3d 569, 573 (6th Cir. 2009)); see United States v. Nichols, 527 F. App'x 344, 348-50 (6th Cir. 2013) (conducting a *de novo* review and rejecting defendant's Eighth Amendment challenge to his sentence); see also State v. Allen, 259 S.W.3d 671, 681 (Tenn. 2008) ("These consolidated cases require us to determine primarily whether the trial courts' imposition of consecutive sentences comports with the Sixth Amendment[.] We review *de novo* issues of constitutional law.") (citing State v. Burns, 205 S.W.3d 412, 414 (Tenn. 2006) ("The resolution of this appeal involves an issue of constitutional interpretation, which is a question of law. Therefore, the standard of review is *de novo* without any presumption of correctness given to the legal conclusions of the courts below.")). In the context of this remedial hearing, Clinard is not challenging the constitutionality of a sentence he has received. He challenges the constitutionality of being exposed to the risk of receiving, at minimum, an automatic life sentence if he is transferred to adult court and convicted of first-degree murder.

"The case or controversy requirement [of Article III] encompasses the concepts of standing and ripeness, both of which are prerequisites to judicial review." United States v. Sparks, 687 F. Supp. 1145, 1147 (E.D. Mich. 1988). A party must allege "some actual or threatened injury" before

raising issues relating to the merits of a case. Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979). "Abstract", "conjectural", or "hypothetical" injury is insufficient for the purpose of establishing standing. Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983). "The ripeness doctrine 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" Airline Prof'ls Ass'n v. Airborne, Inc., 332 F.3d 983, 987 (6th Cir. 2003) (quoting Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)). To determine whether an issue is ripe for adjudication, courts must evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbot Labs. v. Gardner, 387 U.S. 136, 149 (1967). "[C]onstitutional challenges by defendants to a particular punishment 'are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine.'" United States v. Quinones, 313 F.3d 49, 58 (2d Cir. 2002) (quoting Cheffer v. Reno, 55 F.3d 1517, 1523 (11th Cir. 1995) (emphasis in original)).

In United States v. Sparks, the Eastern District of Michigan considered the constitutional challenge of three defendants who asked the court to hear statutory and constitutional challenges to their anticipated sentencing under the sentencing guidelines before the deadline to enter into plea agreements in their case expired. 687 F. Supp. 1145, 1147 (E.D. Mich. 1988). Addressing the defendants' standing to raise a challenge before they had been convicted or pleaded guilty, the court weighed the "pragmatic motivation for ruling on the guidelines" against the "constitutionally mandated case or controversy requirement." Id. Ultimately, the court found that "criminal defendants subject to sentencing under the guidelines can show an 'impending injury,' which is sufficient to confer standing upon defendants seeking to attack the guidelines." Id. at 1148 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). The court further found that "the defendants' challenges involve 'purely legal issues which do not require further factual

13

development'" and, thus, were ripe for decision. Id. (quoting United States v. Ruiz-Villanueva, 680 F. Supp. 1411, 1415 (S.D. Cal. 1988)). The court concluded "there can be no doubt that defendants contemplated plea agreements require a decision as to the validity of the guidelines if they are to make an intelligent and informed choice to plead guilty and thus forego their right to a jury trial." Id.

Like the defendants in Sparks, Clinard faces an "impending injury" of being subject to a mandatory sentence upon conviction that he argues is unconstitutional and, to effectively navigate his prosecution, he must be able to raise that challenge in the context of his transfer hearing. The State argues that Clinard's challenge is not yet ripe because the juvenile court would not have known to what penalties Clinard might be subject in adult court. (Doc. No. 148 at PageID# 6243.) But Clinard has known since the day of the shooting that the State intended to prosecute him for first-degree murder. (See Doc. No. 41, Ex. 1 at PageID# 753). While Clinard might not have known during his original transfer hearing whether the State would file a life without parole notice, there was no mystery as to the potential mandatory minimum sentence to which he would be exposed if transferred to adult court. See State v. Bise, 380 S.W.3d 682, 697 (Tenn. 2012) ("The Court found that the 1989 Act 'afford[ed] judges discretion to select an appropriate sentence with a predetermined statutory range' but did not give judges the 'authority to impose a sentence outside the statutory range.'") (quoting State v. Gomez, 163 S.W.3d 632, 659 (Tenn. 2005)).

Similarly, in United States v. Haynes, 269 F. Supp.2d 970, 984 (W.D. Tenn. 2003), the court found that the defendant's pre-trial challenge to the Federal Death Penalty Act's penalty phase evidentiary standard was ripe for review because it raised a pure question of law and because "'a defendant suffers practical and legally-cognizable disadvantages by postponing a facial challenge . . . until after trial,'" including considering plea agreements. Id. (quoting United States

14

v. Quinones, 313 F.3d 45, 59 (2d Cir. 2002)).[3] See also Parker v. Stewart, No. 17-CV-11962, 2017 WL 3531390, at *3 (E.D. Mich. Aug. 17, 2017) (finding the case ripe for review because "Petitioner's double jeopardy and due process claims raise federal constitutional issues which are fit for judicial decision, and it appears inevitable that petitioner will be re-sentenced or tried in the near future", "[t]he parties require a decision on the constitutional issues in order to make intelligent and informed choices on remand in the state trial court", and "withholding a decision would cause a hardship"); United States v. Ruiz-Villanueva, 680 F. Supp. 1411 (S.D. Cal. 1988) (finding that criminal defendants' pre-trial challenge to the constitutionality of the sentencing guidelines was ripe for adjudication).

Following this persuasive authority, the purely legal questions Clinard raises regarding the constitutionality of an automatic life sentence or life-without-parole sentence imposed on a juvenile offender are ripe for review. See Haynes, 269 F. Supp.2d at 984. Clinard would experience hardship if the Court were to withhold consideration of the constitutional challenge. Whether Clinard would be exposed to unconstitutional sentences if he is to be transferred to and convicted in adult court "necessarily affect[s] the entire trial process, not merely the sentencing state of the proceedings." Quinones, 313 F.3d at 60. For Clinard, the "entire trial process" begins with his transfer proceedings.[4]

---

[3] In Quinones, the Second Circuit "considered purely legal challenges to criminal statutes raised during the pre-trial stage of a prosecution even though the defendants had not yet been—and might never have been—convicted of the challenged statute." 313 F.3d 49, 59.

[4] The interrelatedness of Clinard's juvenile transfer proceeding and adult criminal trial is highlighted by the (constitutionally ineffective) advice Clinard's original counsel gave to waive any challenge to Clinard's transfer to adult court. As the juvenile judge recalled, "'the defense was concerned that the record was developing against their client,' and that the record of the transfer hearing might be used against Clinard at trial or by the corrections department." Clinard, 722 F. App'x at 557 (quoting Postconviction Hr'g, R. 33-3, PID 439, 459).

15

## B.     The Scope of the Sixth Circuit Remand

The State next argues that the Court should not consider Clinard's motion because doing so "runs afoul of the Sixth Circuit's remand." (Doc. No. 144). Specifically, the State argues that this Court already has dismissed the Eighth Amendment challenge Clinard raised in his habeas petition as untimely and unexhausted and Clinard did not challenge that dismissal on appeal.[5] The State also argues that Clinard's motion "seeks determinations outside the scope of Tennessee juvenile proceedings" and, thus, outside of this Court's authority on remand.

The Court previously addressed and rejected these arguments. In its March 18, 2020 Order, the Court found that, because the Sixth Circuit ordered that Clinard receive a *de novo* transfer hearing, he

> may raise federal constitutional arguments now, even if he did not raise them in the 2005 transfer hearing and possibly if he conceded that the claims were untimely in his previous federal habeas corpus proceeding.
>
> And that's precisely what Clinard has done: he argues that the Court should dismiss the petition to transfer him to adult court because he would be subjected, if convicted of the pending charge of first-degree murder, to a sentence that is unconstitutional under the Eighth Amendment of the United States Constitution.

(Doc. No. 101).

As for Clinard's ability to bring a motion to dismiss in a juvenile transfer hearing, the Court has found that:

> In 2005, there were no Tennessee rules preventing a juvenile who is facing transfer to adult court from filing a pretrial motion to dismiss the transfer in which he or she

---

[5] The State argues that "Petitioner now seeks a second bite at the apple by simply repurposing the argument. Yet, the Eighth Amendment claim is still both untimely and unexhausted, as it was when first presented to this Court. This Court should deny it for the same reasons it did previously." (Doc. No. 68 at PageID# 5218). The only "second bite at the apple" Clinard is getting is a new transfer hearing, to which the Sixth Circuit found he was entitled because his attorney at the original transfer hearing provided ineffective assistance of counsel. And the *de novo* transfer hearing ordered by the Sixth Circuit is a distinctly different proceeding than Clinard's previous habeas proceeding. In addition, Clinard's present claim differs from the Eighth Amendment habeas claim he raised previously. With the habeas claim, Clinard had to overcome the deference to state courts required by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). However, in the context of a *de novo* hearing, Clinard is not attacking a prior state-court decision, and the AEDPA confines are absent.

raises a federal constitutional claim. And there <u>was</u> precedent establishing that a juvenile who faces a transfer hearing is entitled to assert his or her constitutional rights during the juvenile proceedings, even if those rights might be waived after transfer. <u>See</u> <u>State v. Womack</u>, 591 S.W.2d 437, 443 (Tenn. Ct. App. 1979).

(Doc. No. 111).

Indeed, in March 2005, Clinard litigated pretrial motions in the juvenile court to protect his Fifth Amendment rights to due process and against self-incrimination. (Motion to Dismiss, Doc. No. 41-19 at PageID# 2530-31; Motion to Suppress, Doc. No. 41-19 at PageID# 2500-05; Hr'g Tr., Doc. No. 41-20 at PageID# 2902-12 (ruling on these motions). Likewise, in <u>Booker</u>, Booker filed multiple motions[6] during his juvenile transfer hearing, including a motion to dismiss his notice of transfer on the basis that "exposure to a mandatory life sentence (of at least 51 years) was unconstitutional in light of <u>Roper v. Simmons</u>, 543 U.S. 551 (2005), <u>Graham v. Florida</u>, 560 U.S. 48 (2010), and <u>Miller v. Alabama</u>, 132 S. Ct. 2455 (2012) . . . and in violation of the Fifth, Sixth, and Eight Amendments and Article I, Sections 8, 9, and 16." Motion to Dismiss Indictment Based on Errors in Juvenile Court Transfer Proceedings, <u>Tennessee v. Booker</u>, No. 108568 (Crim. Ct. for Knox Cnty., Tenn. Sept. 28, 2016). Clinard's ability to bring a constitutional challenge to the transfer petition as a motion in those proceedings is well established.

### C. Clinard's Constitutional Challenge

After Clinard filed his motion to dismiss the petition, the Tennessee Supreme Court held that "Tennessee's automatic life sentence when imposed on juvenile homicide offenders . . . lacks

---

[6] Due to the confidentiality afforded juvenile records, the Court has been unable to obtain a copy of those motions or a copy of a written order denying the motions (if such order exists), but the Court has obtained a copy of Booker's Motion to Dismiss Indictment Based on Errors in Juvenile Court Transfer Proceedings, which he filed on September 28, 2016, in the Criminal Court for Knox County, Division III, after his transfer to adult court. In that motion, Booker lists multiple motions he filed in juvenile court, their alleged bases for relief, and their dispositions by the juvenile judge (all were denied). Booker's motion shows that, in addition to raising an Eighth Amendment argument based on the mandatory minimum sentence to which Booker would be exposed if transferred to adult court, Booker raised Fourth, Fifth, Sixth, and Fourteenth Amendment claims in motions filed in juvenile court. The Criminal Court denied Clinard's Motion to Dismiss Indictment by summary order on February 10, 2017.

individualized sentencing which serves as a bulwark against disproportionate punishment," "goes beyond what is necessary to accomplish legitimate penological objectives," and, thus, "violates the Eighth Amendment." State v. Booker, 656 S.W.3d 49, 66 (Tenn. 2022). The Tennessee Supreme Court then established a remedy for that violation. Id. "[E]xercis[ing] judicial restraint," the court drew its remedy from a previously enacted release eligibility provision created by the Tennessee General Assembly. Id. (citing Tenn. Code. Ann § 40-35-501(h)(1)). Under this provision, the juvenile offender convicted of first-degree murder "remains sentenced to a sixty-year prison term" but "is eligible for, although not guaranteed, supervised release on parole after serving between twenty-five and thirty-six years," to be determined by "an individualized parole hearing in which his age, rehabilitation, and other circumstances will be considered." Id.

As the Court already has found, Booker and its remedy are retroactive. This Court also has found that Miller challenges to life sentences raised by juvenile offenders like those Clinard raises in his motion to dismiss "ha[ve] been mooted by the holding in Booker." Polochak v. Dickerson, No. 2:20-CV-00049, 2023 WL 5353843, at *23 (M.D. Tenn. Aug. 21, 2023). This is because, as another judge of this Court explained, "Booker makes clear that . . . a then-juvenile convicted of first-degree murder . . . receive an individualized parole hearing in which his youth and other circumstances will be considered. Williams v. Leeds, No. 3:12-cv-00523, 2023 WL 336138, at *4 (M.D. Tenn. Jan. 19, 2023) (Richardson, J.). "As Booker indicates, this remedy takes care of the very problem implicated in a Miller claim: the alleged unconstitutionality of the sentence imposed . . . The remedy takes care of the problem because, given Booker's mandate of an individualized parole hearing . . . the sentence is no longer mandatory." Id.

The parties acknowledge a distinction between Booker's case and Clinard's (which, the Court assumes, would extend to Polochak and Williams): Booker already had been transferred to

adult court and tried and convicted as an adult when his unconstitutional life sentence was imposed. In this remedial proceeding, Clinard has not yet been transferred to adult court. Clinard argues that, because of this distinction, his case is not rendered moot by <u>Booker</u>'s holding. But <u>Booker</u> held that "Tennessee's mandatory sentence of life in prison when imposed on a juvenile homicide offender with no consideration of the juvenile's age and attendant circumstances violates the Eighth Amendment's prohibition against cruel and unusual punishment." <u>Booker</u> 656 S.W.3d at 68. Although <u>Booker</u>'s remedy provision addressed only those juvenile offenders already serving mandatory life sentences, its holding provides the relief Clinard seeks. A mandatory life sentence imposed without consideration of Clinard's youth and capacity for rehabilitation is no longer available under Tennessee law. Clinard's motion to dismiss challenging the possible imposition of that sentence therefore will be denied.

The Court will consider the post-<u>Booker</u> sentence to which Clinard may be subject as a significant "other matter" when determining whether Clinard should be transferred to adult court. Tenn. Code Ann. § 37-1-134(b).

## IV.    THE STATE'S TRANSFER PETITION

On appeal from the denial of Clinard's federal habeas petition, the Sixth Circuit found that there was a "reasonable probability" that a Tennessee juvenile judge would have declined to transfer Clinard to adult court absent counsel's deficient performance. <u>Clinard</u>, 722 F. App'x at 565. For the reasons that follow, the undersigned finds that, after holding a new transfer hearing as directed by the Sixth Circuit, Clinard will not be transferred to adult court.

### A.    Findings of Fact

After the Sixth Circuit returned Clinard's case to this Court, Magistrate Judge Joe Brown conducted a *de novo* transfer hearing on April 8 and 9, 2019. (Doc. Nos. 83 & 84). In ruling on motions in limine, Judge Brown determined that Dr. Kimberly Stalford's testimony, reports, and

19

notes would be limited to what she had available at the time of the 2005 transfer hearing. (Doc. No. 81). Judge Brown reserved ruling on the other matters raised in motions in limine until after the hearing, and it does not appear that those subsequent rulings were ever made or recorded. Judge Brown struck Judge Brigham's hearing testimony on Clinard's objection. (Doc. No. 84 at PageID# 5682). The State did not challenge that ruling. The following findings of fact are primarily taken from evidence and testimony introduced at the April 2019 transfer hearing. Limited testimony from the April 2023 transfer hearing is identified when included.

### 1. Clinard's Home Life

Jason Clinard was born in 1990 and raised in rural Tennessee. His father is medically disabled, and his mother works long hours at the zinc plant. (MTMHI Report, Collective Ex. from Fed. Evid. H'rg. (CEX) at P2).[7] Clinard told Dr. Currey that he "rarely" sees his mom because she works a lot of overtime. (Id. at P2).

Six months before the shooting, Clinard's 37-year-old stepsister and family ("the Fults family") moved into Clinard's home, and Clinard was displaced from his bedroom; he slept either on the floor of his parents' bedroom, in the living room, or in the family camper. (Doc. No. 83 at PageID# 5374, 5456-57; Bernet Report, CEX at P22-23; MTMHI Report, CEX at P6). The stepsister's two 16-year-old sons (Clinard's genealogical nephews) picked on him "incessantly," and their mother did the same. (Bernet Report, CEX at P23).

Clinard's parents have hosted approximately twenty foster children over a period of five years. (Doc. No. 83 at PageID# 5457; Bernet Report, CEX at P25; MTMHI Report, CEX at P5). Clinard would sometimes protect the younger or weaker foster children. (Doc. No. 83 at PageID#

---

[7] The Collective Exhibit, which is under seal, is not part of the record but is maintained in hard copy within chambers, as is the practice of this Court.

5457). However, Clinard did not get along with three or four of these children, and he sometimes fought with them. (MTMHI Report, CEX at P5). Clinard felt that the foster children usually provoked those fights, although he would acknowledge that the fights frequently started over something trivial, and he would black out in the midst of fighting. (Doc. No. 83 at PageID# 5372, 5466).

Before the shooting, Clinard had no identified mental-health issues, and he had not received any prior inpatient or outpatient mental health services or counseling. (Doc. No. 83 at PageID# 5475; MTMHI Report, CEX at P2). However, "[e]very now and then" case workers and counselors came to the Clinard home to check on the foster children and met with Clinard "if he got hot." (Bernet Report, CEX at P26). Clinard's father owns at least forty firearms that were kept in the home. (Doc. No. 83 at PageID# 5460).

## 2. Clinard's Psychosocial Stressors

In the summer of 2004, Clinard's football teammate died in a car accident. (Doc. No. 83 at PageID# 5459; MTMHI Report, CEX at P5-P6). Clinard's dog of ten years died in September 2004. (Id.) In October or November of 2004, Clinard's brother was deployed to Iraq. (Id.) Clinard's grandmother died in November 2004. (Id.) Two classmates recently had attempted suicide by shooting themselves; Clinard knew both and considered one a friend. (Doc. No. 83 at PageID# 5459-60; MTMHI Report, CEX at P5). Clinard told Dr. Currey that in February 2005—one month before the shooting—he was depressed and having thoughts of hanging or shooting himself. (Doc. No. 83 at PageID# 5364, 5464). At that time Clinard felt worse about himself than he ever had in his life. (Id. at PageID# 5465). He felt "worthless," like he was "no good," and like the world would be better off without him. (Id. at PageID# 5464). His parents noticed that he was quieter, less talkative, and seemed somewhat depressed, especially in the last few months before the

shooting. (Id. at PageID# 5364, 5456, 5458). His anger was worse, and he had stopped joking "in his usual way." (Id. at PageID# 5364).

### 3. Clinard's School Life

Clinard was in ninth grade at the time of the shooting. His grades at the end of the fall semester of 2004 were all As and Bs. (Id. at PageID# 5557). There is no evidence in the record as to Clinard's grades in the spring semester at the time of the shooting.

Approximately five disciplinary events were noted on Clinard's school record: twice in seventh grade he had been involved in schoolyard fights; once in ninth grade he told a teacher to "shut up"; and, shortly before the shooting, he was disciplined for using tobacco on the bus and fighting after getting off the bus. (MTMHI Report, CEX at P4).

Clinard's ninth-grade algebra teacher Rebecca Grasty remembers Clinard as "an ideal student" who helped other students with their work. (Doc. No. 83 at PageID # 5334). She testified that Clinard "always did his work. Very well-mannered . . . Quiet, but always an ideal student." (Id.) His ninth-grade social-studies teacher Carrie Pellum-Howell testified that she trusted Clinard more than other students. (Id. at PageID# 5351-52). She selected Clinard as "one of [her] two or three in that class" to serve "as a designated helper" when a substitute teacher came in. (Id.) She testified that, even when others were disruptive, "[t]here was never any negative behavior from Jason." (Id. at PageID# 5353). According to her, Clinard was "quiet," "polite," and "very helpful." (Id. at PageID# 5350-52). Pellum-Howell never saw Clinard show any anger or exhibit any signs of depression or suicidal behavior but she testified that she did not think he would have shared his feelings with her if he was upset. (Id. at PageID# 5354-55). In her opinion, students do not usually share suicidal thoughts with teachers. (Id. at PageID# 5355). She further testified that "people who

understand depression understand it's not always exhibited by students being sad or seeming sad. Especially if they're not attention-seeking students." (Id. at PageID# 5354).

Myles Holliday testified that, as Clinard's football coach, he spent more time with Clinard than with other students and had gotten to know him. (Id. at PageID# 5340). Coach Holliday testified that Clinard "did everything we asked. He showed up to practice every single day, worked extremely hard, took great pride in what he was doing." (Id. at PageID# 5341). According to Coach Holliday, Clinard was not overtly aggressive or violent as a football player; rather, he "showed a lot of care and concern for his fellow players." (Id. at PageID# 5342, 5344-45). Coach Holliday testified that he believed that Clinard would be one of the building blocks to a strong foundation on the football team because he "showed that he had good character" and "was a good teammate." (Id. at PageID # 5341-42). During their football interactions, Coach Holliday did not observe any depressive or suicidal behavior exhibited by Clinard. (Id. at PageID# 5348).

On the day before the shooting, Coach Holliday saw Clinard sitting outside the school office. He found that unusual, as Clinard "wasn't a guy that was going to sit in front of [the principal's] office getting in trouble." (Doc. No. 83 at PageID # 5342). Clinard complained about hating his bus driver, which Coach Holliday found "kind of shocking because it was really out of character for [Clinard]." (Id.) He told Coach Holliday that his bus driver had reported Clinard for chewing tobacco on the bus. (Bernet Report, CEX at P25; Doc. No. 41-10 at PageID# 2047). Coach Holliday counseled Clinard in the hallway to accept responsibility for his actions. (Id.)

### 4. The Day of the Shooting

On the morning of March 2, 2005, Jason Clinard woke up at 5:50 a.m. (Clinard Confession, CEX at P38-39). He got ready as usual for school and ate breakfast. (Id.) He took one of his father's firearms from an unlocked gun closet. (Id.) He loaded the gun. (Id. at P46).

23

Clinard walked with his two nephews to the bus stop. His nephews boarded the bus before him. As they walked to the back of the bus, Clinard shot Gregory. She died at the scene. Clinard, 722 F. App'x at 554.

Clinard ran into the woods after the shooting. (Clinard Confession, CEX at P41). Cumberland City Police called Clinard on his cell phone. (Id.) Clinard followed the officers' instructions to come out of the woods and surrendered. (Id.)

Shortly after the shooting, Agent Joe Craig took a statement from Clinard. Clinard told Craig that, when he got the gun earlier that morning, he was thinking about shooting himself but, when he saw the bus coming down the road, Clinard felt angry toward Gregory. (Id. at P43). He told Agent Craig that he "like[d] living too much . . . so . . . ." (Id. at P44). Agent Craig asked Clinard why he shot Gregory. (Id. at P42). Clinard replied, "I hate her." (Id.) Clinard elaborated that he did not like Gregory's attitude and believed she singled him out and mistreated him. (Id. at P45). Agent Craig asked Clinard what he thought would happen next, and Clinard replied: "I'm going to get put in jail. When I go to court I'm going to plea [sic] guilty and I'm going to see what happens after that." (Id.) Agent Craig asked Clinard if he knew "this morning that . . . that there was going to be some ramifications or you would have to uh . . . deal with this after you did this?" to which Clinard answered, "[A]fter I did this? Yes, sir." (Id. at P48). Clinard told Agent Craig that he was prepared to accept responsibility for what he had done. (Id.)

According to the state prosecutor, Clinard came across during his confession "as a very polite, truthful young man" which "might keep him from getting life without parole versus getting life with parole." (Doc. No. 41, Ex. 20 at PageID # 2825). This prosecutor has agreed that Clinard's confession might be used to argue that he is capable of being rehabilitated. (Id.)

24

While being fingerprinted at the jail, Clinard told Agent Craig: "I didn't think I had it in me, but I guess I did" and "I wish I could turn back time." (Doc. No. 66, Attach. 1, PageID# 4953).

On the day of the shooting, the State filed a petition alleging that Clinard is "delinquent in need of rehabilitation." (Doc. No. 41, Ex.1 at PageID# 752). Later that same day, the State sent Clinard to the MTMHI for a psychological examination. (MTMHI Report, CEX at P1). That court-ordered examination was to provide "recommendations to the Stewart County Juvenile Court regarding placement, treatment, amenability to treatment, and risk for offense or re-offense." (Id.)

### 5. Clinard's Testimony at the Second *De Novo* Hearing

Clinard did not testify at the April 2019 transfer hearing. The following findings of fact are made from Clinard's testimony at the April 2023 transfer hearing, which was the only new testimony offered. Like the witnesses who testified at the first *de novo* hearing, Clinard was instructed to testify as if it were August 2005.

Leading up to the day of the shooting, Clinard felt "[d]own and worthless pretty much." (Doc. No. 148 at PageID# 5464, 6189). He had been "kicked out" of his room when the Fults family arrived and relegated to sleeping on the couch and floor, which "made [him] feel like [he] didn't matter." (Doc. No. 148 at PageID# 6188).

Clinard described the Fults family as "aggravating." (Doc. No. 148 at PageID# 6188). They all picked on him and tried to take food from him. (Id.) Clinard did not confront the Fults family because Clinard's father "was enjoying having them there." (Id.) Clinard "felt like [he] couldn't go to anyone," including his mother, about the Fults's behavior because his mom "was working (indiscernible), and [he] didn't want to put anything else on her." (Id.) Clinard testified that, "[m]ost of the time," he was not good at standing up for himself. (Id.)

When asked what the "worst kinds of things [Clinard] thought about doing" during this time, Clinard testified that he "seriously" was thinking of killing himself. (Doc. No. 148 at PageID# 6189). He felt like "it wouldn't have mattered if [he] was there or not." (Id.)

During this time, Gregory accused Clinard and his friends of "dipping" with a "spit bottle" on the school bus. (Id. at PageID# 6191). Clinard had to report to the office the following day. During that meeting, the assistant principal patted Clinard down. The meeting was "awkward" for Clinard. (Id.) The assistant principal told Clinard that he would be punished with suspension and gave Clinard a paper for his parents to sign. (Id.) At that moment, Clinard felt "angry, angry for doing what I – what I done, got in trouble and was getting in trouble for being stupid." (Id. at PageID# 6192). Clinard did not want to tell his parents what had happened. (Id.) He accidentally left the form at school and, when he realized this mistake, he "tried to avoid everybody and went to the back bedroom." (Id.) Clinard acknowledged that he could have told his parents about the in-school suspension even without the form, but he "didn't want to disappoint them . . . [and] just wanted to put it off as long as possible." (Id.) He "was ashamed" and knew he was "going to get in trouble." (Id.)

The next morning, Clinard got up, took a shower, and got a gun. (Id. at PageID# 6192-93). Getting the weapon was not difficult because there were "lots of guns" in Clinard's house. (Id. at PageID# 6193). Clinard was "thinking about shooting [himself]." (Id.) When asked why he was considering something so drastic, Clinard stated that "[h]e didn't want to face the consequences that [he] was under, and [he] felt trapped back into a corner and wasn't sure how to deal it. So [he] felt like that was going to be the best way." (Id.) He stated that he could not face going to school that day with the unsigned form as "it would have just been – it would be worse"; there would have been another meeting with the principal; people would be mad at Clinard; his parents would

26

have been contacted; and, if he had showed up without the signed form, the assistant principal would have given him "a few more days" of suspension. (Id.)

Clinard testified that his plan was to "go behind the house into the woods and kill [himself]." (Id.) Approximately twenty to thirty minutes passed between the time he got the gun and the bus came. (Id.) During this time, Clinard "was trying to talk [himself] into going behind the house and the closer it got time for the bus to get there, the more desperate and more panicked [he] started to feel." (Id.) When he saw the bus coming down the road, Clinard realized he had another option: "[he] could shoot Ms. Gregory." (Id. at PageID# 6195). He "felt like the world was closing in on [him]." (Id.) He felt like he was "in a daze" and things seems "unreal." (Id.) Clinard testified:

> As I was walking towards the bus, I started getting more desperate and desperate because – as I was getting closer, and I – I just couldn't – couldn't go to school. So when I got up to the bus, I – I shot Ms. Gregory.

(Id. at PageID# 6196).

Clinard remembers pulling the trigger. (Id.) He ran into the woods and thought about what he had done. He realized the harm he had caused, and he "didn't feel good about it." (Id. at PageID# 6197). He did not know Gregory was dead. (Id.) He was planning to turn himself in. Clinard then received a phone call from the police, who instructed him to come out of the woods. Clinard immediately complied.

When asked by his counsel whether it made any sense to shoot himself or anyone else "to get out of facing the shame at school," Clinard replied, "No, sir." (Doc. No. 148 at PageID# 6197-98). Clinard elaborated on his statements to Agent Craig on the day of the shooting:

> Q. Okay. You told Agent Craig that day that you had taken the gun, thinking about killing yourself, but you wound up shooting Ms. Gregory in anger. Is that – is that basically true?

27

A. Yes, sir. As I was – I was angry with her, but it was really more anger with myself for the situation I got myself into, and I was feeling desperate the closer I got to the bus door. And so I end up going to shoot her.

Q. Okay. You also told Agent Craig that day "I didn't think I had it in me, but I guess I did." What did you mean by that?

\* \* \* \*

A. I said it to him because I didn't think I could be able to do something so horrible. And I felt awful about it.

Q. Had it seemed real to you?

A. No, sir.

Q. Okay. But now it did, when you're talking to him?

A. Yes, sir.

Q. Okay.

A. (Indiscernible) because they told me I (indiscernible) and I couldn't believe I did something that bad, that horrible.

Q. Now, do you tell Agent Craig anything else?

A. That I wish I can turn back the block. I wish I could undo what I did because I know I impacted a lot of people horribly. And I – and I killed somebody.

Q. Okay. And that was the same day that you told him this; right?

A. Yes, sir.

(Doc. No. 148 at PageID# 6199-6200). When asked how Clinard felt about the shooting, he testified, "I feel horrible. I feel – I can't – it's something a man can't take back. And I wish I hadn't done it – and because I impacted a lot of people very badly. And I – wish I could turn back the clock." (Id. at PageID# 6200).

28

When asked about how it made Clinard feel to see his teachers and coach testifying about him during the hearing, Clinard responded: "I – I was glad they – they thought so highly of me, and I was sad that I let them down and that I disappointed them." (Doc. No. 148 at PageID# 6189).

On cross-examination, Clinard acknowledged that he had been in trouble prior to this incident and had been punished by the school, including receiving a previous suspension. (Id.) He also acknowledged that, at the time Agent Craig was interviewing him, Clinard did not tell anyone he was sorry. (Id.) Clinard testified that, prior to the shooting, he had not thought about whether he "had it in him" to shoot Gregory. (Id.)

### 6. Expert Testimony

Three experts testified at the April 2019 hearing: Dr. M. Duncan Currey, Ph.D.; Dr. Joseph Bernet, MD; and Dr. Kimberly Stalford, Ph.D. Their testimony, in part, relied on testing and diagnoses by Dr. James S. Walker, Ph.D.; Dr. Narciso Gaboy, MD; and Dr. Barbara Snell, MD.[8]

#### a. Dr. M. Duncan Currey, Ph.D., Expert in Child and Adolescent Psychology

Dr. M. Duncan Currey is a licensed clinical psychologist. He is trained to conduct forensic examinations. (Doc. No. 83 at PageID# 5356-58). He worked for MTMHI from 1998 to 1999 and from 2001 to 2005; during the second period, about 50% of his work was with juveniles. (Id. at PageID # 5356-58). Dr. Currey testified as an expert in child and adolescent psychology. (Id. at PageID# 5359).

Clinard was at MTMHI for 26 days. (MTMHI Report, CEX at P1; Doc. No. 83 at PageID# 5591). During that time, Dr. Currey met with Clinard "regularly," for a total of at least five to ten

---

[8] Dr. Snell, when conducting Clinard's intake interview, recorded that Clinard "admits to hearing voices—one telling him to kill himself & one telling him to kill the bus driver. He heard a voice in the past going back ~5 years. When he's angry the voice tells him hurt others. When he's calm, voice tells him kill himself." (Snell Report, CEX at P61) (emphasis added).

hours one-on-one. (Id. at PageID# 5359). In addition, Dr. Currey observed Clinard both deliberately and by chance as Clinard went about his day in the unit. (Id. at PageID# 5360). Dr. Currey led the treatment team and ultimately was responsible for writing Clinard's MTMHI evaluation. (Id. at PageID# 5361).[9]

Dr. Currey personally administered a series of tests to Clinard including the Minnesota MultiPhasic Personality Inventory-Adolescent ("MMPI-A"), Adolescent Pathology Scale ("APS"), Reynolds Adolescent Depression ("RADS"), and Trauma Symptoms Checklist for Children ("TSCC") tests. (MTMHI Report, CEX at P3, P7). In the MMPI-A, which Dr. Currey described as "basically a personality test designed for adolescents," there were no elevations in the significant clinical range but there were "critical items" on the test that indicated that Clinard was depressed. (MTMHI Report, CEX at P7; Doc. No. 83 at PageID# 5378). Dr. Currey was surprised that, based on the MMPI-A results, Clinard does not appear to have a "significant psychopathology," the type of problem that is "typically associated with acting-out behavior." (Doc. No. 83 at PageID# 5378-79).

The results from the APS were consistent with the MMPI-A as "the specific items that Jason endorsed support the hypothesis that he was experiencing symptoms of anxiety, depression, and possible psychotic features." (MTMHI Report, CEX at P7). The initial administration score of the RADS test fell in the "significantly depressed range (94th percentile), and included critical items reflecting feelings of self-harm, worry, decreased appetite, and helplessness." (Id.) The second administration score reflected a decrease in reported symptoms with a total score falling in

---

[9] The MTMHI records include a one-page "Admission Diagnosis and Presenting Problems" document signed by Dr. Barbara Snell, MD, Clinard's admitting physician. (MTMHI Report, CEX at P92). On the day of the shooting, after an interview of unknown duration, at 3:30 PM Dr. Snell noted an "admission diagnosis" of depressive disorder not otherwise specified with suicidal ideation. (MTMHI Report, CEX at P61, Stalford Report, Def. Ex. 1 at 6).

30

the "mildly depressed range (70th percentile)." (Id.) According to Dr. Currey, these results "suggest that Jason may have benefitted from the treatment he received over the course of his evaluation." (Id.)  In addition, Dr. Currey noted that "the results tend to rule out the possibility of exaggeration or feigning of symptoms." (Id.) The TSCC also reflected "a small elevation on the anger and depression scales." (Id.)

During their one-on-one time together, Clinard told Dr. Currey that he had thoughts of hanging himself in the fall of 2004 and had planned to make a noose and hang himself in the woods near his home. (Doc. No. 83 at PageID# 5364). He also recently had thoughts of shooting himself with a gun. (Id.) In noting that Clinard had schoolmates who had made suicide attempts with guns, Dr. Currey testified that "there are some copycat behaviors when young people are around people who have attempted suicide or they've heard of a suicide, that if they're depressed and have suicidal thoughts that sometimes they can put them at greater risk for self-harm." (Id. at PageID# 5365). Clinard reported to Dr. Currey that he slept three to four hours a night and at times felt a decreased need for sleep. (Id. at Page ID# 5365-67).

Clinard described himself to Dr. Currey as having a "short temper" and said that he "tended to get angry easily." (Id. at PageID# 5366). He also described experiencing blackouts from his anger where he would "do things while he was angry and then not remember them later." (Id. at PageID# 5367). Dr. Currey testified that Clinard reported being involved in a couple of fights at school, getting in-school suspension for telling a teacher to shut up, and twice getting out-of-school suspension in the seventh grade for fighting. (Id. at PageID# 5368). Clinard also reported sometimes getting into fights with some of the foster children who would stay with his family. (Id.) Dr. Currey does not view the fighting incidents to be a major issue as he believes that Clinard

did not get into fights any more than other children at school "and that the behavior problems that he'd had were fairly typical schoolboy-type rouses." (Id. at PageID# 5369).

Clinard reported that, for a couple of years, he experienced hearing voices, or "command auditory hallucinations," that told him to hurt himself or others. (Id. at PageID# 5369-70). Clinard also reported visual hallucinations, such as seeing his dead dog, but Dr. Currey explains that such hallucinations are not unusual as they could be related to grief or being accustomed to that animal. (Id. at PageID# 5371). When asked if he thought Clinard "was being honest" about these hallucinations, Dr. Currey responded that he believed Clinard's "reluctance to really admit that he had these unusual symptoms" indicated "he was not only being honest, but he was—it was difficult for him to be honest about it because it was uncomfortable and not the sort of thing you want to talk about." (Id. at PageID# 5371).

Clinard's parents told Dr. Currey that, in the fall prior to the shooting, Clinard had been "less talkative and his anger was worse. He had stopped joking around in his usual way." (Id. at PageID# 5364).

Dr. Currey identifies several psychosocial stressors for Clinard, which include the deaths of his pet dog of ten years and his grandmother, previous fights with foster children in his home, attempted suicides by a friend and by another classmate who were both about 14 years old, an automobile-related fatality of a teammate the previous summer, and a bleeding ulcer. (MTMHI Report, CEX at P5). Dr. Currey believes that the main stressor was that Clinard's older stepsister, her husband, and her 16-year-old twin sons had recently moved in with the Clinard family, which resulted in Clinard being displaced from his bedroom. (Doc. No. 83 at PageID# 5374-75). Clinard felt that his stepsister "picked on him" and that her sons "acted immature." (Id. at PageID# 5375).

Dr. Currey diagnosed Clinard with major depressive disorder, recurrent, severe with psychotic features (hearing voices). (MTMHI Report, CEX at P9). He notes that "hearing voices or having unusual experiences are indicative of the depression itself and how serious the depression is." (Doc. No. 83 at PageID# 5381). Dr. Currey also diagnosed Clinard with alcohol abuse by history, but states that depression is "the overarching clinical picture." (MTMHI Report, CEX at P9).[10]

In making his diagnosis, Dr. Currey states that "you're really trying to look at the big picture." (Doc. No. 83 at PageID# 5380). He testified that he looked at information from the family and what Clinard said himself. (Id.) He considered "other collateral information" such as statements from the social worker and other staff. (Id.) He also considered "objective measures" and "essentially tr[ied] to look at a constellation of factors or symptoms and signs that suggest a clinical diagnosis." (Id.)

Dr. Currey determined that Clinard "probably has been experiencing depression since early childhood, with fluctuations in the duration and intensity of depressive episodes." (MTMHI Report, CEX at P9). He believes these episodes "were probably characterized by increased irritability, anger, sadness, and loneliness, partly in response to identifiable stressors, but also due to internalized conflicts and his inability to manager his negative emotions and cope with stress effectively." (Id.) Dr. Currey believes that Clinard "had bouts of depression in the past, and it was severe enough to indicate that he needed treatment but didn't get treatment." (Doc. No. 83 at PageID# 5380). Dr. Currey opines that "[u]nlike adults, children are less likely to express feelings of depression outwardly, such as sadness, tearfulness, or by making statements to others about

_____

[10] No one has indicated that alcohol played a role in the Gregory shooting. (Doc. No. 83 at PageID# 5381, 5398, 5474, 5520, 5548).

33

their negative mood." (Id.) Instead, "they are more likely to exhibit changes in their normal behavior, such as increased episodes of irritability, anger, and unruliness, or changes in appetite, sleep patterns, or energy level." (Id.) Consequently, "that's part of what makes it difficult to both recognize significant depression in some kids and also to diagnose it in some kids because children are not as—are much less likely than an adult to say, gee, I'm really feeling down and low. And maybe I'm depressed. You know, that's very rare for kids." (Doc. No. 83 at PageID# 5387). There "can be a lot of other behavioral indicators that are missed when an adolescent is depressed." (Id. at PageID# 5386-87).

Dr. Currey testified that, while at MTMHI, Clinard agreed to a trial of an anti-depressant medication. (Id. at PageID# 5445). One week later, Clinard reported that his mood had improved and he was sleeping better. (Id.)

Dr. Currey testified that he refrains from asking patients if they feel remorse or contrition for something they have done. (Id. at PageID# 5433-34).

Dr. Currey does not believe Clinard meets the diagnostic criteria for conduct disorder. (Id. at PageID# 5383-84). In his view, Clinard shows empathetic behaviors and lacks any meaningful history of violence. (Id. at PageID# 5376, 5385-86). Further, Dr. Currey explains that Clinard's profile "didn't look like the kind of profile that we think of as the—as having major psychopathology that would lead to violence." (Id. at PageID# 5421). Dr. Currey cites Clinard's concern for his father's health and his dog and raising a sheep in 4-H as examples of empathetic behavior. (Id. at PageID# 5376). Dr. Currey further opines that, "despite the nature of his charges", Clinard poses "a low risk of further violence." (Id. at PageID# 5391). Dr. Currey also opines that the statement, "that history of violence is the best predictor of violence," is an "adage" or "generalization" and that "when you take someone with no history of violence [like Clinard], it's

34

a -- it's really a gross generalization. You can look at many other variables." (Id. at PageID# 5385-86).

He explains that Clinard "was a depressed young man and that in the wrong circumstances he might act impulsively to harm himself or, for that matter, somebody else." (Id. at PageID# 5441). He believes that Clinard's depression "most likely compromised his judgment and reasoning skills, and put him at an increased risk for inappropriate behavior, such as acting on his angry impulses." (Id.) Dr. Currey finds that Clinard's "reports of suicidal thoughts and plans reflect the thinking of a boy who may have developed self-defeating cognitive patterns in a dysfunctional attempt to cope with his negative emotions," reiterating that "[s]uicidal thoughts in children sometimes reflect feelings of guilt and shame that can manifest in self-destructive behaviors, or in aggression toward others." (Id.) As Dr. Currey put it, "I wouldn't want to see a depressed impulsive adolescent anywhere near a lethal weapon." (Id.)

Dr. Currey is well familiar with the facilities and the programs the State has available to treat someone like Clinard for depression, including Woodland Hills. (Id. at PageID# 5389-90). Dr. Currey recommends that Clinard be placed "in an adolescent residential treatment program where he c[ould] receive individual and group therapy, family counseling, anger management training, and psychiatric monitoring of his medication." (MTMHI Report, CEX at P10). Dr. Currey explains that there are facilities available through DCS that could provide counseling, treatment and medication for Clinard. (Doc. No. 83 at PageID# 5389).

He points out that "[d]epression is very treatable," with a treatment success rate of 60 to 80%. (Id. at PageID# 5390, 5447). Dr. Currey also observed that while at MTMHI Clinard responded well to a structured, supportive environment during the evaluation, and his potential for learning to manage his behavior appropriately would probably increase with ongoing supervision

35

and guidance. (Id. at PageID# 5388; MTMHI Report, CEX at P10). Dr. Currey opines "with a reasonable degree of medical certainty that [Clinard] could probably be rehabilitated in the course of a couple of years if he received these services that are available." (Doc. No. 83 at PageID# 5390, 5447).

In response to a question from Magistrate Judge Brown, Dr. Currey confirmed that Clinard would have been subject to treatment by DCS for a period of four years and, in his expert opinion, "that would have been likely—been more likely than not to have had a successful outcome." (Id. at PageID# 5446). Dr. Currey elaborated:

> And I think the research on treatment for depression backs that up. Even the chronic depression is a serious problem. I think the research is consistently – has consistently shown that between 60 to 80 percent of people who are treated for depression, as long as they get medication, psychotherapy and behavioral interventions, they have a high probability of getting better. And the time frame for that can range from right away to two to three years. Again, depending on the circumstances. So there's every reason to believe that he would improve with treatment.

(Id. at PageID # 5447). Magistrate Judge Brown pressed, asking Dr. Currey to consider Clinard's possible rehabilitation in light of the four years of treatment and the nature of his offense, and Dr. Currey unequivocally replied that "Yes," his view was that "more likely than not" the four years would be sufficient to treat Clinard. (Id.)

**b.    Dr. William Bernet, MD, Expert in Child and Adolescent Psychiatry**

Dr. William Bernet is board certified in child and adolescent psychiatry as well as forensic psychiatry. (Doc. No. 83 at PageID# 5450). He attended Harvard Medical School and has held numerous leadership roles at children and adolescent units, including medical director of the psychiatric hospital at Vanderbilt and consultant at Woodland Hills, where he treated teenagers. (Bernet CV, CEX at P11-19). In addition, he has conducted hundreds of youth civil and criminal

forensic evaluations and testified about 200 times in various states and different parts of Tennessee. (Id.) He was appointed by former Tennessee Governor Sundquist to study and revise commitment laws. (Id.) He has authored numerous peer-reviewed publications regarding child and adolescent psychiatry. (Doc. No. 83 at PageID# 5450-52, 5488-89). He has interviewed hundreds of juveniles. (Id. at PageID# 5473). He testified as an expert in child and adolescent psychiatry. (Id. at PageID# 5454).

Dr. Bernet was hired by the defense in 2005 to conduct a forensic psychiatric evaluation of Clinard. (Bernet Report, CEX at P20). Dr. Bernet evaluated Clinard over the course of three meetings—once at MTMHI and twice at Dr. Bernet's office—for a total of about four hours. (Id.) Dr. Bernet interviewed Clinard's parents for over an hour, directed them to complete the Child Behavior Checklist, administered various tests to Clinard, directed additional psychological and neuropsychological testing, and arranged for Clinard to have genetic testing of the monoamine oxidase A (MAOA) gene and the 5-hydroxytryptamine or serotonin transporter (5-HTT) gene. (Id. at P20-21). Dr. Bernet also reviewed all inpatient and outpatient medical records from Vanderbilt University Medical Center, inpatient medical records from MTMHI, and Dr. Currey's psychological evaluation of Clinard. (Id. at P21-22). Dr. Bernet's report noted that Dr. Narcisco Gaboy, Clinard's attending psychiatrist at MTMHI, had diagnosed Clinard with major depressive disorder, severe, with psychotic features. (Id. at P21).

During their face-to-face interviews, Clinard told Dr. Bernet that he was "sad" and "felt bad" most of the time, and it was "particularly bad" starting about six months before the shooting. (Id. at P23-24). He described not being interested in things he used to enjoy, such as hunting and football. (Id.) He said that he sometimes felt hopeless, lacked an appetite, had difficulty going to sleep because he woke up at night, but other times he slept too much. (Id.) Clinard told Dr. Bernet

that he felt "worthless, no good, that the world would be better off without [him]." (Id.) Dr. Bernet thinks Clinard's statement "is a pretty poignant expression of being depressed." (Doc. No. 83 at PageID# 5464).

Clinard described what Dr. Bernet called "significant suicidal ideation." (Bernet Report, CEX at P24). Clinard said in recent months he had thought about shooting himself and hanging himself. (Id.) When he was feeling very depressed, he had auditory hallucinations that said, "Kill yourself." (Id.) When Dr. Bernet asked Clinard to estimate his depression on scale of 0 (feeling as bad as he could imagine) to 10 (feeling as good as he could estimate), Clinard said on the day of the evaluation he was a 3 or 4 on that scale and, on the worst day he ever had, he had been a 1, which was one month prior to the shooting. (Id.)

Clinard described hearing voices at times telling him to harm himself or others. (Id. at P29). He reported at MTMHI seeing his deceased dog a couple of times. (Id.) Dr. Bernet considers Clinard's self-reporting of these symptoms to be "real" because they are "actual symptoms that actually do occur in people who are depressed. In other words, it just seems unlikely that the case of making something up that he would make up an actual symptom that actually does occur in people who have serious depression." (Doc. No. 83 at PageID# 5472-73). Further, Dr. Bernet notes that Clinard had reported these same symptoms to MTMHI staff members. (Bernet Report, CEX at P21).

Clinard told Dr. Bernet that he had a very short temper. (Id. at P24). He said it felt like someone else was controlling his body when he was angry and like he had "tunnel vision." (Id.) Dr. Bernet notes that sometimes Clinard's "angry outbursts would be involved in getting into a fight." (Doc. No. 83 at PageID# 5465). Dr. Bernet considers these fights impulsive on Clinard's

part and felt "that is important to pay attention to." (Id. at PageID# 5466). Clinard stated that his outbursts of anger at times caused him to have memory lapses. (Id.)

Clinard told Dr. Bernet that he did not remember shooting his bus driver, but Dr. Bernet believes that Clinard just did not want to talk about what had happened in all likelihood because, by that time, he already had told the events to several people, including the policeman, the intake person at MTMHI, and other people on the unit. (Id. at PageID# 5470).

Dr. Bernet relays that genetic testing revealed that Clinard has two copies of the "short allele" of 5-HTT. (Bernet Report, CEX at P30). A study shows that people with two short alleles are "about four times more likely in stressful situations to be depressed and suicidal." (Doc. No. 83 at PageID# 5478). This genetic predisposition shows that Clinard is biologically more vulnerable to stress than a typical person. (Bernet Report, CEX at P30-31). According to Dr. Bernet, "[t]his finding is consistent" with Clinard's history "in that Jason became more and more depressed as he experienced more stress at home and at school." (Id.) However, Clinard's genetic testing for the MAOA gene is not remarkable, indicating that he is not predisposed to violence. (Id. at P30).

Clinard's parents told Dr. Bernet that Clinard is generally compliant with rules and did what they asked of him, but they noticed that his demeanor changed a few months after Clinard's stepsister and her family moved into the Clinard home. (Doc. No. 83 at PageID# 5455). Since that time, Clinard's parents described him "as being somewhat depressed" and said that he was not "as talkative and as outgoing as in the past" and "seemed grumpy at times." (Id. at PageID# 5458). Charlie Clinard, Jason's father, said, "[a]though Jason reportedly was in a good mood at school, at home he was quieter than usual and grumpy." (Bernet Report, CEX at P22). Clinard's parents

reported that he had been spending a lot of time alone in the family's camper rather than in the house. (Id.)

Dr. Bernet feels that he interviewed Clinard enough to get a sound understanding of his personality and mental condition. (Doc. No. 83 at PageID# 5463). While he believes that Clinard "may have exaggerated some things," in Dr. Bernet's opinion, Clinard was not malingering. (Id. at PageID# 5471-72). Dr. Bernet arrived at this conclusion for several reasons. He found that "the history ma[d]e sense with all the different information," the history was consistent with information provided by Clinard's parents, and the multiple psychological tests (Structured Interview of Reported Symptoms (SIRS) and Miller Forensic Assessment of Symptoms (M-FAST)) showed no signs of malingering. (Id. at PageID# 5471-72). Further, he says that "[i]t is common for individuals who have mental problems to exaggerate them somewhat during a forensics evaluation." (Bernet Report, CEX at P35).

From interviewing Clinard and his parents, Dr. Bernet identified several psychosocial stressors in Clinard's life, including the following: conflict and competition with foster children; conflict with his stepsister and her family who had moved into his house, causing him to sleep on either the living room floor or in his parents' bedroom; conflict with the victim bus driver; the deaths of a teammate, his grandmother, and his dog; two classmates who survived suicide attempts; a stomach ulcer; the medical disability of Clinard's father; and the deployment of Clinard's older brother to Iraq. (Doc. No. 83 at PageID# 5459-60). Dr. Bernet states that it was "really unusual" for a 14-year-old child to have to confront so many things. (Id. at PageID# 5460).

Dr. Bernet arranged for Dr. James S. Walker, Ph.D to administer psychological and neuropsychological tests on Clinard. (Bernet Report, CEX at P30). From those tests, Dr. Walker

determined that Clinard "does not appear to have any coping skills and his social skills are very limited. He is very immature." (Id.)

Dr. Bernet diagnosed Clinard with major depressive disorder, recurrent, severe, with psychotic features (occasionally hearing voices). (Id. at P31). Dr. Bernet explains that, for a diagnosis of major depressive disorder, the DSM-IV requires five or more symptoms. (Id.) He determined that Clinard met six of the symptoms: depressed mood, diminished pleasure in activities, sleep disturbance, fatigue, diminished ability to think or concentrate, or indecisiveness, and recurrent suicidal ideation. (Id. at P32). He noted that "diminished ability to concentrate . . . showed up on the neuropsych testing." (Doc. No. 83 at PageID# 5483). Dr. Bernet characterized the hearing of voices as "a signal of serious depression." (Id. at PageID# 5473). Dr. Bernet has "no doubt" that Clinard suffers from depression. (Id. at PageID# 5473-74).

Although he believes that major depressive disorder is Clinard's main problem, Dr. Bernet added secondary diagnoses "worth noting": (1) attention deficit hyperactivity disorder (ADHD) based largely on reports from early childhood, and (2) intermittent explosive disorder. (Id. at PageID# 5466-67, 5481-82). Dr. Bernet made the secondary diagnosis of intermittent explosive disorder based upon Clinard getting into fights impulsively over trivial matters and blacking out during the course of the fight. (Id. at PageID# 5466). Dr. Bernet believes that Clinard "was probably typical of the group of boys who get into fights," but thinks "the nature of the fights were somewhat unusual because of . . . what he described as blacking out." (Id.)

According to Dr. Bernet, the genetic testing, which showed Clinard has two short alleles on the gene for serotonin uptake, further supports the diagnosis of depression. (Id. at PageID# 5478). Dr. Bernet explains, "So that just fit the whole story, meaning that he had the genotype that makes him more susceptible to stress. He had a whole series of stressors, and he appeared to be

41

depressed and suicidal. So the genetic thing isn't really determinative, but it certainly—it supports the picture that we've been presenting here." (Id.)

Dr. Bernet determined that Clinard's depression "was manifested by being unusually quiet and isolating himself from family members." (Bernet Report, CEX at P22). Like Dr. Currey, Dr. Bernet determined that, at the time of the offense, Clinard was trying to cope with unusually severe stressors in his family and other parts of his life. (Id. at P32-33). Because Clinard did not have the psychological strength and resources to cope with these difficult events, Dr. Bernet states that Clinard became more depressed and suicidal. (Id. at P33). "When he felt angry and frustrated, he did not have the coping skills to deal with his problems in an appropriate manner." (Id.)

Dr. Bernet is optimistic regarding rehabilitation. Dr. Bernet testified that depression "is probably the most treatable" of mental illnesses, and that it is "[d]efinitely" likely that Clinard could overcome depression within "a couple years" if given the kind of treatment available at a place like Woodland Hills, which is available through DCS. (Doc. No. 83 at PageID# 5488-90, 5514). He opines the same regarding the diagnosis of a relatively "mild version" of intermittent explosive disorder. (Id. at PageID# 5491). When asked if having his particular genetic make-up means Clinard cannot be rehabilitated, Dr. Bernet said, "No, I don't think it's accurate at all. I think it's a mistake to stay that" because "[i]n terms of the vast majority of people's genetic makeups, people are not controlled by them" and, in this particular situation with the two short alleles and the knowledge about depression, treatment of depression, "there's no reason to think that would hinder his treatment." (Id. at PageID# 5480-81).

Dr. Bernet states that "severe depression sometimes does recur" and, "[a]lmost always . . . if the previous treatment worked, you go back and you do the same treatment over again because

almost always it works again." (Id. at PageID# 5490). A person could ward off recurrence, he explains, by being "really careful" to maintain certain regimens. (Id.)

Dr. Bernet also opines with a reasonable degree of medical certainty that Clinard could get control of the intermittent explosive disorder with treatment as he believes that Clinard has a mild version of the disorder manifested by only a few fistfights. (Id. at PageID# 5491).

As for future dangerousness, Dr. Bernet testified that the risk of Clinard acting in a seriously violent and harmful manner is "very, very low" and "approximately the same as an average citizen on the street." (Id.) He explains that "[t]here's been research on risk factors [for future dangerousness], especially for teenagers" and Clinard lacked many "important risk factors." (Id. at PageID# 5492). For example, he has not been involved in a gang. He does not have a prior record of delinquency. Although he was suspended from school for several fights in the seventh grade, Clinard does not have a history of chronic, recent, and frequent violence. He did not have an early onset of violent behavior, i.e., prior to age 12. Also, substance abuse was not involved in Clinard's violent behavior, and he said he abstained from alcohol since January 2004. Clinard did not grow up in a family in which aggression among family members was modeled as acceptable. Clinard did not have maladaptive personality traits such as lack of empathy. Clinard was not physically or sexually abused. He did not have the MAOA gene variant that has been associated with violence. (Bernet Report, CEX at P36). Plus, his track record of behaving well and applying himself at home and at school was a positive factor indicating a reduced risk. (Id.) Consistent with this risk-factor analysis, Dr. Bernet opines: "I think what he did was extremely out of character. And I think that the future, his day-to-day behavior is going to be driven by his basic personality, not by that incident that happened one time." (Doc. No. 83 at PageID# 5492).

As to Dr. Stalford's theory that "violent behavior in the past is the best predictor of violence," Dr. Bernet describes it as a "general statement" that is "probably . . . true some of the time" for certain type of offenses but he believes that Clinard's action was the type of a single, out-of-character action that would not trigger this adage. (Id. at PageID# 5494). Dr. Bernet opines that, with medication and psychotherapy, Clinard's depression could be rehabilitated as quickly as in a few weeks to months, with continued treatment for a period of time to make sure his improvement remained stable. (Id. at PageID# 5514).

Dr. Bernet opines that it was "very unlikely" that Clinard would ever get diagnosed with antisocial personality disorder because "even at 15 he does not have the criteria that you're supposed to have by 15 in order to later get that diagnosis." (Id. at PageID# 5488).

### c.    Dr. Kimberly Stalford, Ph.D., Expert in General Psychiatry

Dr. Stalford is a general psychiatrist board certified in general adult psychiatry. (Doc. No. 83 at PageID# 5535, 5538). In 2005 she worked at Gateway Hospital where she had been working since March 2002. (Stalford CV, CEX Report at P37). There, she was responsible for children, adolescent, adult, and geriatric patients. (Doc. No. 83 at PageID# 5535). Approximately 15 to 20 percent of her patients were juveniles. (Id. at PageID# 5538). During Clinard's transfer hearing, Dr. Stalford testified as an expert in general psychiatry. (Id. at PageID# 5537).

Dr. Stalford was asked to review Clinard's records in late May of 2005. (Id. at PageID# 5566). She testified that it took her four to six weeks to review the records and, at that time, she "had more questions than [she] had answers." (Id. at PageID #5566-67). She reviewed the reports by Drs. Currey and Bernet, the MTHMI records, Clinard's statement to Agent Craig, Clinard's medical and school records, a letter to Dr. Thomas Garbenstein [Clinard's primary physician] from

a doctor who performed psychological testing of Clinard in 1995, and notes and reports from other physicians. (Id. at PageID# 5540-41; Stalford Report, Def. Ex. 1 at 1).

Dr. Stalford testified that she believes that conducting a "face-to-face" personal interview of the subject is "important." (Doc. No. 83 at PageID# 5576-77, 5588). However, she did not interview Clinard before the original transfer hearing due to scheduling conflicts and personal responsibilities. (Id. at PageID# 5575-76).[11] She did not ask the prosecutor to delay the hearing until she could interview Clinard. (Id. at PageID# 5576). She testified that it is "useful" to interview family because "parents know their children" but she did not interview Clinard's parents prior to the original transfer hearing. (Id. at PageID# 5577).

She spoke with TBI Agent Joe Craig and Kim Rush, the director of the adolescent unit at MTMHI, who answered her questions about the behavioral technicians or the persons that were sitting with Clinard. (Id. at PageID# 5578-79). Dr. Stalford "assume[s]" that Rush worked with Dr. Currey or the nurses who worked with him on Clinard's case but she does not know. (Doc. No. 83 at PageID# 5579). Dr. Stalford has never been to MTMHI and does not know the physical layout of MTMHI, nor has she observed the nurses working there. (Id. at PageID# 5578).

Dr. Stalford opines that Clinard did not meet the criteria for major depressive disorder. (Id. at PageID# 5549). In her opinion, the results from Clinard's psychological testing relied upon by Dr. Currey and Dr. Bernet were "confusing" and did not indicate major depressive disorder. (Id. at PageID# 5565-66; Def. Ex. 1 at 23). She did not contact either doctor to discuss their testing or reports. (Doc. No. 83 at PageID# 5578-80).

Dr. Stalford does not believe Clinard met the criteria for depressed mood. She finds it notable that, prior to the shooting, Clinard had never received any inpatient or outpatient

---

[11] Dr. Stalford interviewed Clinard after the first transfer hearing. Magistrate Judge Brown excluded from evidence any information she gleaned as a result of that interview. (Doc. No. 83 at PageID# 5530-34).

psychiatric treatment; he had never seen a psychiatrist, a therapist, or a school counselor; and never mentioned any mental health issues to his doctor. (Stalford Report, Def. Ex. 1 at 7). In Dr. Stalford's opinion, "It does not appear to me that either the school or his parents were concerned with the depression to the point that they made an appointment with a mental health expert." (Id.) She further opined: "Prior to the shooting, I did not see any physician or nurse that cared for Jason express concern for depressive or psychotic symptoms." (Id.)

She notes that Clinard had never reported any psychotic symptoms to his mother and that his family has a history of depression therefore "[o]ne would assume that this was a family that would recognize depression and seek help." (Id. at 18-21). She opines that "if you have a severe depression with active psychotic symptoms and suicidal thoughts, I would expect and do see— usually always see students—and adults, it affects their work. They miss class. They are truant. They sleep through class. And then when they're in class they're doing poorly, so you'll see their grades drop." (Doc. No. 83 at PageID# 5557).

Dr. Stalford takes issue with Clinard's self-reported symptoms of depression largely "because of so much of what the objective team was noting." (Id. at PageID# 5549). She assigns much weight to the notes of the MTMHI nurses who observed that Clinard's mood mostly was upbeat and his affect was "bright." (Id. at PageID# 5549-50). These nurses reported that Clinard slept without difficulty, had no trouble eating, and interacted well with others. (Id. at PageID# 5551-52).[12]

_____

[12] When asked to reconcile the nurses' notes that they "didn't really observe many objective symptoms of depression from Mr. Clinard" with Clinard's self-reported symptoms of depression, Dr. Bernet, who has the most relevant experience of any of the experts, responded: "And my take on that is that it's a controlled environment. And in the structured supportive environment, particularly where someone's there for an evaluation and they're dealing with legal issues, it's kind of a rarefied situation. I don't think it's necessarily a good environment to say, okay, based on what— the behaviors that we see here in the hospital, that that necessarily gives us a window into what was happening before he came into the hospital." (Doc. No. 83 at PageID# 5412). He elaborated: "[W]hen somebody's admitted to a psychiatric hospital[,] their life is suddenly on hold. It's not a normal situation. I would think it could be intimidating,

46

Dr. Stalford finds it "very pertinent" that Clinard denied auditory hallucinations through his entire stay at MTMHI or behave in a way that was "floridly psychotic." (Stalford Report, Def. Ex. 1 at 13; Doc. No. 83 at PageID# 5558-59, 5591). She also thinks "it was worth noting that the issue of Jason's depression was not brought up until AFTER the shooting." (Id. at 20) (emphasis in original). She states that "[o]ne would suspect that a severe depression with psychotic features would affect his ability to get out of bed, attend school regularly, concentrate and keep his grades up, etc." (Id. at 21). She notes that in the months prior to the shooting, Clinard continued to play football and that, in her opinion, "[s]everely depressed patients with psychotic features rarely are interested in physical exercise." (Id. at 22).

Dr. Stalford testified that to correlate one gene to depression was "a little simplistic" and that "for every study that did show that there was some connection to depression, there have been some that showed it was not." (Doc. No. 83 at PageID# 5563). Dr. Stalford testified that she could not say with any certainty that "there's a test or a gene that . . . [shows] that's what causes depression." (Id.)

Dr. Stalford points out that there is nothing in the record showing that Clinard had any previous suicidal behaviors, such as there were "no previous suicide attempts, no history of cutting, [and] no history of overdosing." (Id. at PageID# 5558). In her opinion, although Clinard reported experiencing hallucinations, there is no objective evidence in the record showing that he suffered from any auditory or visual hallucinations. (Id. at PageID# 5558-59).

---

kind of frightening. So the fact that he or other people in that situation don't act out or they're manageable, to me it says more about the environment than it does about the person." (Id. at PageID# 5413).

Dr. Stalford does not believe that Clinard intended to shoot himself. (Stalford Report, Def. Ex. 1 at 25). She states, "He has no history of suicidal behavior, gesturing, or attempts. If he truly intended to kill himself, he would have gone to a secluded spot where he would not be found or rescued." (Id.) She believes that Clinard "was very angry with Mrs. Gregory, and acted on that anger with a violent ending." (Id.)

In her heavily-redacted report prepared after the August 2, 2005 hearing,[13] Dr. Stalford stated that she "strongly believe[s]" that Clinard "has been malingering." (Id. at 19). In 2019 during Clinard's first *de novo* transfer hearing, she walked her earlier statement back: "In August of 2005 would I say that he was malingering? I don't think that I could say anything for certainty, but I would say that I was concerned about that based on the inconsistencies and exaggeration of symptoms." (Doc. No. 83 at PageID# 5583).

Dr. Stalford believes that "the records supported more of a diagnosis of depressive disorder NOS or not otherwise specified." (Id. at PageID# 5544). She notes that this diagnosis "is used if the depressive features do not meet the criteria for Major Depressive Disorder." (Stalford Report, Def. Ex. 1 at 23). Dr. Stalford testified: "I don't think any diagnosis is ever absolute, truly, because, for instance, with bipolar disorder we might diagnose someone with depression and then later they get manic and change the diagnosis." (Doc. No. 83 at PageID# 5587).

Dr. Stalford does not believe Clinard suffers from intermittent explosive disorder because she did not see any indication that the shooting was an act of a sudden irresistible impulse, which she says is one of the three criteria for the diagnosis. (Id. at PageID# 5560-61).

---

[13] The report is undated. However, Dr. Stalford prepared her report after interviewing Clinard and his parents. (Doc. No. 83 at PageID# 5530). Magistrate Judge Brown ruled that only information in her report that was available to her on August 2, 2005 would be considered. (Id. at PageID# 5533). The undersigned includes it here to show how Dr. Stalford's opinions changed after she interviewed Clinard and his parents.

In addition, she "would have been very mindful of his looking for symptoms of developing antisocial personality disorder." (Doc. No. 83 at PageID# 5571-72; Stalford Report, Def. Ex. 1 at 23). Dr. Stalford did not say anything in her report about conduct disorder because she "wasn't sure he met it [the criteria] based on what [she] read in the record." (Id. at PageID# 5597). She later testified that "[n]o one believes he meets that diagnosis." (Id. at PageID# 5613). Nevertheless, she testified that "when you have a situation such as this where you have a person who shot and killed another person, that is such an act of profound violence that you really need to think about that [diagnosis of antisocial personality disorder] as a possibility." (Id. at PageID# 5567-68). According to her, "[a]lthough depressive disorders are treatable, many in the psychiatric community have found the success rate for treating antisocial personality traits dismal." (Stalford Report, Def. Ex. 1 at 25). She agrees with Dr. Bernet that no diagnosis of antisocial personality disorder can be made until the age of 18. (Doc. No. 83 at PageID# 5568). She believes, however, that Clinard could be diagnosed with antisocial personality disorder in the future. (Id. at PageID# 5567). She concedes that there is no peer reviewed literature supporting the notion that "if a 14-year-old commits one terribly violent act such as murder that he cannot be treated." (Id. at PageID# 5609).

Dr. Stalford testified that, at the time of the 2005 transfer hearing she did not see any evidence in the record about contrition or sadness from Clinard regarding the victim or her family. (Id. at PageID# 5587-89, 5598). Dr. Stalford admits that there are no statements in the record where someone specifically asked Clinard how he felt about what he had done. (Id. at PageID# 5604). Dr. Stalford opines, contrary to Drs. Currey and Bernet, that Clinard's history of violence could be a predictor of future violence, and "perhaps the best predictor." (Id. at PageID #5567-68).

Dr. Stalford testified that it was "challenging" to successfully treat depression. (Id. at PageID# 5570-71). She testified that for people who have recurrent episodes of depression the relapse rate of having another episode is between 60 and 80 percent. (Id. at PageID# 5563-64). She cited what she calls the "one third rule, which means one-third [of depressed patients] we are very successful at treating," one-third are helped but not successfully treated, and one-third are not helped at all. (Id. at PageID# 5571).

Regarding Clinard's future dangerousness, Dr. Stalford opined that the outlook was unfavorable based on two interrelated theories, a "moral compass theory" and a "past violence theory." With respect to the moral compass theory, she testified:

> [W]hen someone makes an act like that [as did Jason when he shot Ms. Gregory], there really is a question about the moral compass. And if someone's really truly lacking that moral compass, that is very difficult to treat. And, in fact, you know, that's what we worry about with antisocial behavior or antisocial personality disorder is that it is difficult to treat. And that's hard to – that's hard – you know, that is a very difficult medical psychological issue to address.

(Stalford, Hr'g Tr., R.83, PageID# 5609; see also Stalford First Transfer Hr'g Tr. at 163, R.42- 21, PageID# 3154 ("What I think we can't treat are the moral guideposts of right and wrong")). With respect to the past-violence theory, she testified that "a history of violence . . . is the single best predictor of violence" and so when a youth has killed someone, "I think we would want to absolutely consider that that type of violence could be . . . the best predictor." (Stalford, Hr'g Tr., R.83, PageID# 569).

### 7.    Documentary Evidence

Clinard cited a report of the U.S. General Accounting Office ("GAO"). (See Pet. Post-Hr'g Br., Doc. No. 86 at PageID# 5731). The GAO studied the transfer of juveniles for certain categories of charges, including "violent" charges. Its study showed that, even for violent charges in six selected states that allowed transfer of very young offenders, the transfer of any 14-year-old to

adult court, even for violent charges, is very rare. Clinard also cited a report from the U.S. Sentencing Commission which shows that the mean sentence for murder in the nation is 224 months, which could be served in 190 months or about 15.8 years. (Id. at PageID# 5732).

In response to a question regarding data documenting the transfer rate in first-degree murder cases, Clinard's counsel pointed to the previously submitted affidavit of Rebecca Turner, Litigation Counsel for the Campaign for the Fair Sentencing of Youth. In her affidavit, Turner cites statistics known to her organization showing that life-without-parole sentences for children aged 14 are "very rare." (Doc. No. 93, Ex. 1 at PageID# 5805) (showing that, from 2005-2012, Turner identified only eight cases in which a 14-year-old defendant was sentenced to life without parole; after Miller, Turner is aware of only one life-without-parole sentence imposed on a 14-year-old).

Clinard relies on these studies "to compensate for the fact that juvenile records are confidential and hence he lacks access to decisions showing that 14-year-olds in situations similar to him have not been transferred to adult court, which is the kind of legislative fact ordinarily available by searching case law." (Doc. No. 98 at PageID# 5842). The State previously objected to admissibility of the Turner affidavit (Doc. No. 94 at PageID# 5815) but did not renew its objection at the 2023 hearing.

### B. Analysis

Tasked by the Sixth Circuit with holding "a new transfer hearing" by applying the law independently as a juvenile court sitting in August 2005, the parties and the Court agree that it should apply the version of Tennessee Code Annotated § 37-1-134 that was in effect at that time in deciding whether Clinard should be transferred to adult court.

51

Tennessee Code Annotated § 37-1-134(a) (2005) provides the circumstances in which juvenile courts "shall" transfer a juvenile charged with a delinquency based on conduct that is designated a crime or public offense under the laws of Tennessee to be dealt with as an adult in a criminal court of competent jurisdiction. Id. "The disposition of the child shall be as if the child were an adult" if the child is less than 16 years old and charged with a certain offense, such as first degree murder, and the juvenile court finds that are "reasonable grounds" to believe (A) that the "child committed the delinquent act as alleged;" (B) that the "child is not committable to an institution for the developmentally disabled or mentally ill;" and (C) that the "interests of the community require that the child be put under legal restraint or discipline." Id. § 37-1-134(a)(1), (4)(A)-(C). If these requirements are satisfied, the court "may transfer" the juvenile to be tried as an adult. Id. § 37-1-134(a).

A transfer to criminal court pursuant to this section "terminates the jurisdiction of the juvenile court over the child with respect to the delinquent acts alleged." Tenn. Code Ann. § 37-1-134(c). If the juvenile court retains jurisdiction, any child is released from that jurisdiction upon the child's nineteenth birthday, regardless of the seriousness of the offense. Tenn. Code Ann. § 37-1-103(c) (2005).

In determining whether a juvenile must be put under legal restraint or discipline in the interests of the community, the court shall consider the following factors "among other matters":

(1)    The extent and nature of the child's prior delinquency records;

(2)    The nature of past treatment efforts and the nature of the child's response thereto;

(3)    Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4)    Whether the offense was committed in an aggressive and premeditated manner;

(5)    The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6)    Whether the child's conduct would be a criminal gang offense . . . if committed by an adult.

52

Id. § 37-1-134(b).[14] "[T]here is no requirement that all considerations be present." State v. Wilson, No. W2003-02394-CCA-R3CD, 2004 WL 2533834, at *2 (Tenn. Crim. App. Nov. 8, 2004). Further, as the statutory language explicitly indicates, "[t]his list is by no means exclusive." State v. Groomes, No. M1998-00122-CCA-R3-CD, 2000 WL 1133542, at *7 (Tenn. Crim. App. Aug. 10, 2000). Because the issues raised in Clinard's motion to dismiss and the transfer petition are "inextricably intertwined," the Court will consider the sentences Clinard might receive if transferred and "other matters" identified and discussed below.

### 1. First and Second Criteria of Tenn. Code Ann. § 37-1-134(a)(4)(A)-(B)

Clinard concedes that the State has met its burden in proving the first two criteria set forth in Tennessee Code Annotated § 37-1-134(a)(4)(A)-(B): whether there are reasonable grounds to believe that (1) the "child committed the delinquent act as alleged" and (2) the "child is not committable to an institution for the developmentally disabled or mentally ill." (Doc. No. 88 at PageID# 5754).

### 2. Third Criterion of Tenn. Code Ann. § 37-1-134(a)(4)(C)

The third criterion is whether there are reasonable grounds to believe that the "interests of the community require that the child be put under legal restraint or discipline." Tenn. Code Ann. § 37-1-134(a)(4)(C). In considering whether community interests require transfer, the Court will consider the six factors set forth in Tennessee Code Annotated § 37-1-134(b), "among other matters" as appropriate.

---

[14] The current statute adds a seventh factor: "[w]hether the child has a history of trauma or abuse, including, but not limited to, the child being a victim of a human trafficking offense as defined in § 39-13-314." Tenn. Code. Ann. § 37-1-134 (b)(7).

### a. The extent and nature of the child's prior delinquency records

The statute seems to assume a child charged with a transferrable offense will have prior juvenile convictions or charges. Clinard, however, does not.

To the extent his school disciplinary record is relevant under this subsection, Clinard has been punished for fighting (once two years ago and once during the current school year), for telling a teacher to shut up (during the current school year), and once or twice for tobacco-related infractions (during the current school year). Drs. Currey and Bernet do not find the fights significant and believe Clinard did not fight any more than other typical children at his school.

Although using tobacco products is illegal for someone Clinard's age, Clinard's football coach explained that using tobacco "was a huge issue for everybody [on the football team]." (Doc. No. 83 at PageID# 5349). Coach Holliday testified that it "seems like everybody in Tennessee . . . was born with chewing tobacco already in their lip because everybody was—everybody, it [i]s just rampant, everybody chew[s] tobacco. They'[ll] take a bottle and they[] spit it on the bus. And so that was on the of things we had to fix in our culture on the football team is that we weren't going to do those things."[15] (Id.) It does not appear that, by using tobacco products, Clinard was acting any differently than other members on the football team or any differently than many members of his community.

This factor weighs against transfer.

---

[15] The Court changed Coach Holliday's verb tense to reflect the legal fiction that his testimony occurred in 2005.

54

### b. The nature of past treatment efforts and the nature of the child's response thereto

Clinard also has no history of mental health treatment. As a result, says Clinard, there is no evidence that he has "squandered any second chances or has proven difficult to treat." (Doc. No. 93 at PageID# 5791). (See Doc. No. 83 at PageID# 5475) (Dr. Bernet testifying that Clinard's response to past treatment is "not a factor because he'd never had treatment. He had never been identified as having psychiatric or psychological issues."). The State, conversely, argues that Clinard's lack of prior treatment "cast[s] doubt on [his] argument that his depression was severe" and "weakens any credible argument that [he] suffered from these diagnoses so significantly that he was unable to control his impulses on March 2, 2005." (Doc. No. 144 at PageID# 6138). The State's argument is better addressed in the context of considering Clinard's mental health diagnoses and the likely success of treatment for those diagnoses. See infra at pp. 56-64.

In a 1994 review of a juvenile's transfer to adult court, the Tennessee Court of Criminal Appeals found that, in the absence of a prior juvenile record, this statutory factor was "inapplicable." State v. Holmes, No. 01C01-9303-CC-00090, 1994 WL 421306, at *2 (Tenn. Crim. App. Aug. 11, 1994). More recently, at least one juvenile court applying this provision found that the lack of a prior delinquency record and past treatments efforts favored the juvenile. See Kimball v. State, No. E2006-01562-CCA-R3-PC, 2007 WL 2757634, at *6 (Tenn. Crim. App. Sept. 24, 2007) (listing the juvenile court's findings on each statutory factor to be considered for possible transfer to adult court, one of which was "[Petitioner] has neither a prior delinquency record nor past treatment efforts, both favoring [Petitioner]").

This factor weighs against transfer.

### c. Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person

Clinard's offense was the greatest offense against a person. This factor weighs in favor of transfer.

### d. Whether the offense was committed in an aggressive and premeditated manner

Clinard's offense was aggressive; he fatally shot his school bus driver as he boarded the school bus.

There is evidence to show that Clinard's crime was premeditated. Clinard told his coach on the day before the shooting that he hated Gregory because she had punished him for using tobacco and fighting. Clinard loaded the gun he used to kill Gregory twenty or thirty minutes before the bus came. Although he did not typically wear a coat, Clinard wore a large coat that morning that concealed the gun. A few hours after the shooting, Clinard agreed with Agent Craig's leading question asking if he had waited until his nephews had walked clear before he did anything so that he did not hit them or other kids.[16] (Doc. No. 41, Attach. 10 at PageID# 2048). Clinard told Agent Craig that he liked living too much to kill himself, hated Gregory, did not like her attitude, and believed she singled him out.

The Sixth Circuit noted that the post-conviction trial court held "that the evidence 'established without question' that Ms. Gregory's murder was premeditated. Clinard did not question that factual conclusion, nor would such a challenge succeed in light of AEDPA deference." Clinard, 722 F. App'x 552, 563 n.7. AEDPA deference does not apply here, however,

---

[16] Clinard's answers to Agent Craig's open-ended questions are not as clear on this matter. (Doc. No. 41 at PageID# 2044). And Joe Fults's testimony was simply that, when the bus stopped for the boys, he and Clinard were standing in the doorway of the house with Clinard behind Joe; when Clinard said, "Come on, Joe," Joe opened the door and walked out and went on the bus." (Doc. No. 41-21 at PageID# 3215).

56

and Clinard now contends that the shooting was not premeditated but was instead a suicidal impulse turned outward when he saw Gregory and became angry. There is evidence in the record to support this contention, including Clinard's testimony at the second *de novo* hearing and Dr. Bernet's testimony that "[s]uicidal thoughts in children sometimes reflect feelings of guilt and shame that can manifest in self-destructive behaviors, or in aggression towards others." (MTMHI Report, CEX at P10; Bernet Testimony, Doc. No. 83 at PageID# 5506).

Considering the evidence in full, the fourth factor weighs in favor of transfer.

### e. The possible rehabilitation of the child by use of procedures, services, and facilities currently available to the court in this state

The juvenile court has "wide discretion" in the factors it can consider when determining if a juvenile is amenable to rehabilitation. State v. Bell, No. W2014-00504-CCA-R3-CD, 2015 WL 1000172, at *4 (Tenn. Crim. App. Mar. 4, 2015) (citing State v. Layne, 546 S.W.2d 220, 224 (Tenn. Crim. App. 1976)). "In making a decision whether a juvenile is amenable to treatment or rehabilitation, the Juvenile Judge may consider many factors including testimony by expert witnesses, the type of facilities available, length of stay in these facilities, the seriousness of the alleged crime, and the attitude and demeanor of the juvenile." State v. Strickland, 532 S.W.2d 912, 920 (Tenn. 1975); see also Booker, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *19 (Tenn. Crim. App. Apr. 8, 2020) (applying the State v. Strickland factors) reversed on other grounds 656 S.W.3d 49. A court can in good faith rely on all or none of these factors as long as there are reasonable grounds supporting the decision. Bell, 2015 WL 1000172, at *4.

### i. Testimony of expert witnesses

Three experts opined as to Clinard's mental state at the 2019 transfer hearing: Dr. Currey and Dr. Bernet testified on Clinard's behalf; Dr. Stalford testified for the State.

Dr. Currey is a licensed clinical psychologist with training in conducting forensic examinations. He worked at MTMHI for approximately six years. For four of those years, about half his work was with juveniles. Dr. Currey met with Clinard regularly over a period of 26 days and observed him deliberately and by chance as Clinard went about his days at MTMHI. Dr. Currey led Clinard's treatment team at MTMHI and conducted a full battery of psychological assessments on Clinard.

Dr. Bernet is board certified in child and adolescent psychiatry, general psychiatry, and forensic psychiatry. He has extensive experience evaluating youth in inpatient and outpatient psychiatric settings. He has authored numerous peer-reviewed publications regarding child and adolescent psychiatry. Dr. Bernet evaluated Clinard over the course of three in-person meetings. He also interviewed Clinard's parents. Dr. Bernet performed psychological testing on Clinard and arranged for others to perform neuropsychological and genetic testing on Clinard.

Dr. Kimberly Stalford is a general psychiatrist. In 2005, she worked at Gateway Hospital where she was responsible for patients of all ages. Approximately 15 to 20 percent of her patients were juveniles. Dr. Stalford did not interview Clinard, his parents, or anyone on his treatment team. She spoke with TBI Agent Craig about Clinard. She also spoke to Kim Rush, the director of the adolescent unit at MTMHI, but Dr. Stalford does not know if Rush worked with Dr. Currey or was involved in Clinard's treatment. Dr. Stalford's opinion is based upon her review of Clinard's records.

Drs. Currey and Bernet diagnosed Clinard with major depressive disorder. Dr. Bernet also diagnosed Clinard with intermittent explosive disorder and attentive deficit hyperactivity disorder, diagnoses he considered minor but "worth noting." Dr. Stalford opines that she does not believe Clinard meets the criteria for major depressive disorder or intermittent explosive disorder. She

believes that the records support a diagnosis of depressive disorder not otherwise specified. She further believes that Clinard could be diagnosed with antisocial personality disorder in the future.

Clinard argues that Dr. Stalford's opinion lacks an adequate basis. (Doc. No. 93 at PageID# 5780). He asks the court to find her opinions pertaining to Clinard inadmissible or, alternatively, to hold that her opinions lack meaningful weight. (Id.) The State argues that Clinard attacked Dr. Stalford's fitness as an expert witness through motions in limine and Judge Brown ruled that "Dr. Stalford['s] testimony and reports and notes are limited to what [s]he had available and considered at the time of the [original 2005 transfer] hearing. The result of any interview [s]he conducted after the hearing will not be considered." (Doc. No. 81) (Text Order). Clinard was given an opportunity to question Dr. Stalford's qualifications before her April 2019 hearing testimony, and Judge Brown accepted her as an expert in psychiatry in general. (Doc. No. 83 at PageID# 5537-40).

The record reflects that Dr. Stalford was asked to review Clinard's records in May 2005. (Id. at PageID# 5566). Dr. Stalford testified that it took her four to six weeks to review the records and, at that time, she "had more questions that [she] had answers." (Id. at PageID #5566-67). Even though she admitted that she believes conducting a "face-to-face" personal interview of the subject is "important," (id. at PageID# 5576-77, 5588), Dr. Stalford did not interview Clinard, despite his availability, because of her scheduling conflicts. She did not ask the prosecutor to continue the hearing so she could interview Clinard. (Id. at PageID# 5576). She did not speak to any health care professional who had substantial interaction with Clinard, although she did speak with TBI Agent Joe Craig. (Stalford Report, Def. Ex. 1 at 1). Even though she considers it "useful" to interview a subject's parents because "parents know their children," she did not interview Clinard's parents prior to her August 2005 hearing testimony. (Doc. No. 83 at PageID# 5576-77). And even though she thought there were inconsistencies between the nurses' notes and Dr. Currey's reports, she did

not call Dr. Currey to discuss what he had found. (Id. at PageID# 5578). Nor did she contact Dr. Bernet, even though she had questions about his report, in particular about Clinard's possible malingering. (Id. at PageID# 5579-80). While she eventually interviewed Clinard and his parents, she only did so after the 2005 hearing that ended with Clinard's transfer to adult court.

Dr. Stalford is not a child psychologist or child psychiatrist. As a general psychiatrist, her experience with juveniles is a small part of her practice at Gateway Hospital. (Id. at PageID# 5534-35, 5538). Unlike Drs. Currey and Bernet, she has never worked in a correctional or forensic setting like MTMHI or Woodland Hills. (Stalford CV, CEX at P37). She has never been to MTMHI. (Doc. No. 83 at PageID# 5578). Given these circumstances, the Court concludes that Dr. Stalford's opinions are admissible, but they will be afforded less weight in light of her area of expertise, her experience, and her records-only review.

Dr. Stalford's opinion appears to rest on three primary factors: her belief that Clinard is lying about his symptoms, what she calls the lack of "objective" evidence of the criteria for major depressive disorder with psychotic features, and her belief that Clinard could be diagnosed with antisocial personality disorder and, thus, that his prospects for rehabilitation are weak. The Court finds these factors to be unsupported by the weight of the evidence.

First, in Dr. Stalford's undated written report, she stated that she "strongly believe[s]" Clinard has been malingering. However, while testifying at Clinard's transfer hearing, she said that she couldn't say anything for certain but "was concerned" he might be malingering. In support of her concern that Clinard is malingering, she mentions that Clinard attended school regularly, earned good grades, and played football. According to Dr. Stalford, "[o]ne would suspect" that a person with a severe depression with psychotic features would have trouble getting out of bed,

60

attending school regularly, concentrating, and keeping his grades up. And, in her opinion, severely depressed people with psychotic features rarely are interested in physical exercise.

Dr. Currey, who regularly met with Clinard and observed him over a 26-day-period and is specifically trained to be alert to malingering, found Clinard's answers to be "sincere and reliable." He stated that the results of the RADS test "tend to rule out the possibility of exaggeration or feigning of symptoms." (MTMHI Report, CEX at P7). Dr. Bernet testified that his three in-person interviews with Clinard were enough to provide him with a sound understanding of Clinard's personality and mental condition. While he believes that Clinard "may have exaggerated some things," Dr. Bernet believes Clinard was not malingering. (Doc. No. 83 at PageID# 5471-72). Dr. Bernet arrived at this conclusion for several reasons. He found that "the history ma[d]e sense with all the different information", the history was consistent with information provided by Clinard's parents, and the multiple psychological tests (Structured Interview of Reported Symptoms (SIRS) and Miller Forensic Assessment of Symptoms (M-FAST)) showed no signs of malingering. (Id. at 5471-72). Further, he testified that "[i]t is common for individuals who have mental problems to exaggerate them somewhat during a forensics evaluation." (Bernet Report, CEX at P35). In addition, he explains that, "with adolescents there's a wide range of variability. So if his parents reported something and he told the social worker [something else], it doesn't mean that he's not being forthcoming about it. It may be that he either doesn't recall or—it's just something that he's experiencing differently at different times." (Doc. No. 83 at PageID# 5409).

Second, Dr. Stalford opined that the following evidence supports her belief that the only evidence of Clinard's depressive and psychotic symptoms is self-reported and therefore lacking in credibility: Clinard had never received prior psychiatric or psychological treatment; he had never mentioned any mental health issues to his doctor; neither his parents, doctor, teachers, nor coach

seemed concerned about depressive or psychotic symptoms; he never reported any psychotic symptoms to his mother; his family has a history of depression and therefore "[o]ne would assume that this was a family that would recognize depression and seek help"; the issue of his depression was only brought up after the shooting; and "[i]f he truly intended to kill himself, he would have gone to a secluded spot where he could not be found or rescued."

Dr. Currey explains, however, that "[u]nlike adults, children are less likely to express feelings of depression outwardly, such as sadness, tearfulness, or by making statements to others about their negative mood." (MTMHI Report, CEX at P9). Instead, "they are more likely to exhibit changes in their normal behavior, such as increased episodes of irritability, anger, and unruliness, or changes in appetite, sleep patterns, or energy level." (Id.) Consequently, "that's part of what makes it difficult to both recognize significant depression in some kids and also to diagnose it in some kids because children are not as—are much less likely than an adult to say, gee, I'm really feeling down and low. And maybe I'm depressed. You know, that's very rare for kids." (Doc. No. 83 at PageID# 5387). There "can be a lot of other behavioral indicators that are missed when an adolescent is depressed." (Id. at PageID# 5386-87).

Some of these behavioral indicators are present in this record. Clinard's father told Dr. Bernet and MTMHI staff that Clinard's mood had recently changed, that he was quieter than usual, grumpy, and had been spending a lot of time alone. His parents noticed that his anger was worse, and he had stopped joking "in his usual way." (Id. at PageID# 5364). Clinard's football coach observed out-of-character behavior from Clinard the day before the shooting. Clinard, who only had two minor disciplinary infractions on his school record, recently had gotten in trouble at school for telling a teacher to shut up, for using tobacco, and for fighting. Although Clinard's grades were good in the fall semester of 2004, the record does not contain any information indicating whether

62

Clinard's grades dropped in the spring semester just prior to the shooting when he reported feeling the worst he had in his life.

Clinard's genetic testing also supports the diagnosis of depression. (Bernet Report, CEX at P31). Clinard has two copies of the short allele of the 5-HTT gene, which, according to Dr. Bernet, "indicates that he was biologically more vulnerable to stress than the typical person. In stressful and difficult situations, Jason was more likely to become depressed and suicidal than most other people." (Id.) Dr. Bernet finds these results "consistent" with Clinard's history "in that Jason became more and more depressed as he experienced more stress at home and at school." (Id.)

Dr. Stalford assigns much weight to the notes taken by MTMHI nurses who observed that Clinard's mood was mostly upbeat, his affect was "bright," he slept without difficulty, had no trouble eating, and interacted with others. When asked to reconcile the nurses' notes that "didn't really observe many objective symptoms of depression from Mr. Clinard" with Clinard's self-reported symptoms of depression, Dr. Bernet opined, "And my take on that is that it's a controlled environment. And in the structured supportive environment, particularly where someone's there for an evaluation and they're dealing with legal issues, it's kind of a rarefied situation. I don't think it's necessarily a good environment to say, okay, based on what—the behaviors that we see here in the hospital, that that necessarily gives us a window into what was happening before he came into the hospital." (Doc. No. 83 at PageID# 5412). He elaborated: "[W]hen somebody's admitted to a psychiatric hospital[,] their life is suddenly on hold. It's not a normal situation. I would think it could be intimidating, kind of frightening. So the fact that he or other people in that situation don't act out or they're manageable, to me it says more about the environment than it does about the person." (Id. at PageID# 5413).

63

Dr. Stalford excluded psychotic features from her possible diagnosis of Clinard because Clinard did not report hearing voices or behave in a way that was "floridly psychotic" during his time at MTMHI. (Doc. No. 83 at PageID# 5558-59, 5591). Clinard reported to Drs. Currey, Bernet, and Snell that he heard voices "occasionally." Dr. Snell, when conducting Clinard's intake interview, recorded that Clinard "admits to hearing voices—one telling him to kill himself & one telling him to kill the bus driver. He heard a voice in the past going back ~5 years. When he's angry the voice tells him hurt others. When he's calm, voice tells him kill himself." (Snell Report, CEX at P61) (emphasis added). Dr. Currey believes Clinard's reluctance to admit that he had experienced auditory and visual hallucinations indicates that "he was not only being honest, but he was—it was difficult for him to be honest about it because it was uncomfortable and not the sort of thing you want to talk about." Dr. Bernet considers Clinard's self-reporting of these symptoms to be "real" because they are "actual symptoms that actually do occur in people who are depressed. In other words, it just seems unlikely that the case of making something up that he would make up an actual symptom that actually does occur in people who have serious depression." (Doc. No. 83 at PageID# 5472-73). Further, according to Dr. Bernet, the hearing of voices is "a signal of serious depression." (Id. at PageID# 5473).

Third, Dr. Stalford believes that Clinard could be diagnosed with antisocial personality disorder in the future because, "when you have a situation such as this where you have a person who shot and killed another person, that is such as act of profound violence that you really need to think about that [diagnosis] as a possibility." She opines that the success rate for treating antisocial personality traits is "dismal." However, Dr. Bernet explained that an adult cannot be diagnosed with antisocial personality disorder if he has not been diagnosed with conduct disorder by the age of 15. None of the three doctors who spent time with Clinard diagnosed him with conduct disorder.

There was no record of conduct disorder in Clinard's medical records from before the shooting. And Dr. Stalford agrees that Clinard did not meet the criteria for conduct disorder at age 15 and that no diagnosis of antisocial personality disorder can be made until the age of 18. (Currey, Hr'g Tr., R.83, PageID# 5383-84; Bernet, Hr'g Tr., R.83, PageID# 5484; Stalford, Hr'g Tr., R.83, PageID# 5597, 5613-14).

Dr. Currey believes that Clinard's depression "most likely compromised his judgment and reasoning skills, and put him an increased risk for inappropriate behavior, such as acting on his angry impulses." He finds that Clinard's "reports of suicidal thoughts and plans reflect the thinking of a boy who may have developed self-defeating cognitive patterns in a dysfunctional attempt to cope with his negative emotions," reiterating that "[s]uicidal thoughts in children sometimes reflect feelings of guilt and shame that can manifest in self-destructive behaviors, or in aggression toward others." Like Dr. Currey, Dr. Bernet determined that, at the time of the offense, Clinard was trying to cope with unusually severe stressors in his family and other parts of his life. (Bernet Report, CEX at P32-33). Because Clinard did not have the psychological strength and resources to cope with these difficult events, Dr. Bernet states that Clinard became more depressed and suicidal. (Id. at P33).

Considering the testimony of the three expert witnesses regarding Clinard's mental health, the Court credits the opinions of Drs. Currey and Bernet over the opinion of Dr. Stalford. The Court finds that, at the time of the offense, Clinard was suffering from major depressive disorder, recurrent, severe, with psychotic features.

### ii. Seriousness of the alleged crime

The crime was undisputedly very serious, and Clinard admits that he committed it.

### iii.     Attitude and demeanor of the juvenile

Clinard's parents and teachers describe him as polite, kind, helpful, hardworking, trustworthy, and compliant. Before the shooting, he was not aggressive or violent toward teachers or adults or other players on the football field. His coach described Clinard as having "good character" and showing "a lot of care and concern for his fellow players." Dr. Currey notes that Clinard demonstrates empathetic behaviors, such as sleeping on the floor in his parents' room to help his father with medical needs, caring for his dog, and raising a sheep in 4-H. Clinard is protective of the younger foster children living in his home. While he has been in some schoolyard fights, Clinard did not have a history of seriously aggressive or dangerous behavior prior to the shooting.  Dr. Currey notes that Clinard has not been known to use a weapon in a fight and did not have a history of being cruel to animals, setting fires, vandalizing property, or disrespecting the rights of others. Dr. Stalford points out that Clinard "demonstrated some characteristics that should be noted" including Clinard's "love for his family and dog, his helping other children at school and at MTMHI, and his genuine concern for his nieces and parents." (Stalford Report, Def. Ex. 1 at 24). Even the state prosecutor described Clinard "as a very polite, truthful young man" and agrees that his confession might be used to argue that he is capable of being rehabilitated. (Doc. No. 41, Attach. 20 at PageID # 2825).

After the shooting, Clinard exited the woods behind his house immediately upon being instructed to do by the police. He complied with all instructions given by law enforcement. He confessed to the shooting and accepted responsibility his actions, telling Agent Craig: "I'm going to get put in jail. When I go to court I'm going to plea [sic] guilty and I'm going to see what happens after that." He also told Agent Craig: "I didn't think I had it in me, but I guess I did" and "I wish I could turn back time." (Doc. No. 66, Attach. 1, PageID# 4953).

The State argues that Clinard has not taken responsibility for his actions because "[Clinard's] account [of the shooting] fails to own up to the full circumstances of the murder and thus [he] fails to take full accountability for his actions in committing it." (Doc. No. 146 at PageID# 6165). However, during the April 2023 hearing, Clinard readily admitted that he shot Gregory. He testified that he was angry with Gregory and shot her in anger, although he was "really more angry with [himself] . . . ." (Doc. No. 148 at PageID# 6198). Clinard explained what the statements he made to Agent Craig shortly after the shooting meant. As to "I didn't think I had it in me, but I guess I did", he explained: "I said that to him [Agent Craig] because I didn't think I could be able to do something that horrible. And I felt awful about it." As to "I wish I could turn back time", Clinard explained he meant that he "wish[es] could undo what I did because I know I impacted a lot of people horribly." (Doc. No. 148 at PageID# 6199).

The State further contends that, "although Clinard stated he 'felt awful' for what happened and wished he could turn back the clock so that the incident never happened, he did not directly apologize at his hearing" or "indicate any efforts to make amends or show contrition to the family of the victim." (Doc. No. 146 at PageID# 6165). Yet in response to his counsel's question of "how do you feel about it [the shooting]?", Clinard testified, "I feel horrible. I feel – I can't – it's something a man can't take back. And I wish I hadn't done it and – because I impacted a lot of people very badly. And I – I wish I could turn back the clock." (Doc. No. 148 at PageID# 6199).

### iv.    Available treatment facilities

Dr. Currey is very familiar with the facilities and the programs the State has available to treat someone like Clinard for depression, including Woodland Hills Youth Development Center. (Doc. No. 83 at PageID# 5389-90.) Dr. Currey recommends that Clinard be placed "in an adolescent residential treatment program where he c[ould] receive individual and group therapy,

67

family counseling, anger management training, and psychiatric monitoring of his medication." (MTMHI Report, CEX at P10). Dr. Currey explains that there are facilities available through DCS that can provide counseling, treatment, and medication for Clinard.

Dr. Bernet likewise opines that "appropriate treatment for Jason is available through the juvenile justice system." (Bernet Report, CEX at P35). Having worked there himself for about five years, he believes that the mental health staff at Woodland Hills have the skills and resources to meet Clinard's needs. (Id.)

<blockquote>

**v.    Length of stay and likely success of treatment within that time**

</blockquote>

The shooting occurred on March 2, 2005. Clinard's nineteenth birthday falls on March 23, 2010. Accordingly, the juvenile court's jurisdiction can last, at most, a little more than four-and-a-half years (precisely 4 years, 7 months, and 21 days).

Dr. Currey testified that depression is "very treatable." (Doc. No. 83 at PageID# 5390). He testified that, with a reasonable degree of medical certainty, Clinard "could probably be rehabilitated in the course of a couple years if he received these services that are available." (Id.) He reiterated that he believed Clinard was "more likely than not" to have a successful outcome, and "the research on treatment for depression backs that up" as "between 60 to 80 percent of people who are treated for depression, as long as they get medication, psychotherapy and behavioral interventions, they have a high probability of getting better. And the time frame for that can range from right away to two to three years." (Id. at PageID# 5446-47). Dr. Currey says "there's every reason to believe that [Clinard] would improve with treatment." (Id. at PageID# 5447). Dr. Currey firmly believes "that more likely than not the four years would have been sufficient to treat [Clinard]." (Id.)

Dr. Currey observed that Clinard "responded well to a structured, supportive environment during the evaluation, and his potential for learning to manage his behavior appropriately will probably increase with ongoing supervision and guidance." (MTMHI Report, CEX at P10). He explains that "[a]dolescents with similar histories typically respond best to therapeutic, supportive, structured, organized living environments where the goals, consequences, and rewards are clear." (Id.)

Likewise, Dr. Bernet concludes that "[t]he mental conditions that led to Jason's violent behavior in the past are treatable." (Bernet Report, CEX at P36). Indeed, Dr. Bernet testified that depression "is probably the most treatable" psychiatric illness. (Doc. No. 83 at PageID# 5489). He states that the "great majority" of people who have depression get better if they receive appropriate treatment, medication, psychotherapy, and attention to their environments. (Id.) According to Dr. Bernet, the "usual treatment for major depressive disorder and intermittent explosive disorder in an adolescent with a serious degree of externalizing behaviors is individual and group psychotherapy in the context of a highly structured treatment program in a residential setting." (Bernet Report, CEX at P35). He indicates that "[p]sychotropic medication is helpful in treating both the depression and the impulsivity." (Id.)

According to Dr. Bernet, someone with major depressive disorder could be treated for weeks to months and be successfully rehabilitated. (Doc. No. 83 at PageID# 5514). Dr. Bernet opines with a reasonable degree of medical certainty that Clinard "definitely" could overcome his depression with treatment. (Id. at PageID# 5489). He reports that Clinard "appeared motivated for treatment and very interested in resolving these conditions and any symptoms associated with them." (Bernet Report, CEX at P36). He notes that Clinard participated appropriately in the treatment program when he was at MTMHI. (Id.)

69

Dr. Stalford, conversely, testified that it is "challenging" to treat depression. (Doc. No. 83 at PageID# 5571). She cited what she calls the "one third rule, which means one-third [of depressed patients] we are very successful at treating," one-third are helped but not successfully treated, and one-third are not helped at all. (Id.) She testified that for people who have recurrent episodes of depression the relapse rate of having another episode is between 60 and 80 percent. (Id. at PageID# 5563-64). While Dr. Bernet agrees that "severe depression sometimes does recur", in his opinion, "[a]lmost always . . . if the previous treatment worked, you go back and you do the same treatment over again because almost always it works again." (Id. at PageID# 5490). A person could ward off recurrence, he explains, by being "really careful" to maintain certain regimens. (Id.)

Dr. Bernet opines with a reasonable degree of medical certainty that Clinard can control intermittent explosive disorder with cognitive behavior therapy because he believes Clinard has a mild version of intermittent explosive disorder. (Id. at PageID# 5491). Medication, Dr. Bernet notes, is sometimes necessary to treat the disorder. (Id.)

### vi.    Likelihood to reoffend

Dr. Stalford believes Clinard could pose a danger to others because "a history of violence . . . is the single best predictor of violence." (Id. at PageID# 5569; Stalford Report, Def. Ex. 1 at 25). She concedes that there is no peer-reviewed literature supporting her statement that, "if a 14-year-old commits one terribly violent act such as murder that he cannot be treated." (Doc. No. 83 at PageID# 5609).

Dr. Currey opines that, "despite the nature of his charges," Clinard poses "a low risk of further violence." (Id. at PageID# 5391). Dr. Currey also opines that the statement, "that history of violence is the best predictor of violence," is an "adage" or "generalization" and that "when you

70

take someone with no history of violence [like Clinard], it's a -- it's really a gross generalization. You can look at many other variables." (Id. at PageID# 5385-86).

With respect to the adage that violent behavior in the past is the best predictor of violence, Dr. Bernet opines that the Gregory shooting was "one single very serious but out-of-character incident that wouldn't trigger" it. (Id. at PageID# 5494). Dr. Bernet opines that the risk of Clinard acting again in a seriously violent and harmful manner is "very, very low." (Id. at PageID# 5491). He states it would be "approximately the same as an average citizen on the street." (Id.)

In giving this opinion, Dr. Bernet considered that the most serious external stressors that contributed to Clinard's violent behavior have ended or resolved themselves. (Bernet Report, CEX at P36). He also found significant that Clinard "does not manifest some of the most important risk factors for future violent behavior" such as gang involvement; prior record of delinquency; history of chronic, frequent, and recent violence; early onset of violent behavior; substance abuse involved in his violent behavior; family structure in which aggression was modeled as acceptable; maladaptive personality traits such as lack of empathy; physical or sexual abuse; or the MAOA gene that has been associated with violence. (Id.) Further, Dr. Bernet noted "protective factors" in Clinard's history "that should reduce the risk of future violent behavior" including his intact family, supportive parents, appropriate peer relationships, and a fairly good academic record. (Id.) Plus, his track record of behaving well and applying himself at home and at school was a positive factor indicating a reduced risk. (Id.) Consistent with this risk-factor analysis, Dr. Bernet opines: "I think what he did was extremely out of character. And I think that the future, his day-to-day behavior is going to be driven by his basic personality, not by that incident that happened one time." (Doc. No. 83 at PageID# 5492).

71

### vii.     Summary

Considering the expert witness testimony and other evidence regarding Clinard's diagnoses, his attitude and demeanor, the type of facilities available to treat his diagnoses, the maximum length of time he could stay in juvenile custody, the seriousness of his crime, his likelihood to reoffend, and the expected success of his treatment within the time he would be in juvenile custody, the Court finds that the fifth factor weighs against transfer.

### f.     Whether the child's conduct would be a criminal gang offense if committed by an adult

Clinard's conduct was not gang related. This factor weighs against transfer.

### g.     Other matter—Clinard's age at the time of the offense

The Supreme Court directs that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." Roper, 543 U.S. 551, 570. At the time Clinard committed his offense, he was a child in the eyes of the law and the law directs that children are different. Miller, 567 U.S. 460, 471.

> First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."

Id. (quoting Roper, 543 U.S. at 570).

The stated purpose of the Tennessee juvenile justice system in 2005 was to "[p]rovide for the care, protection, and wholesome moral, mental and physical development of children coming within its provisions" and to "remove from children committing delinquent acts the taint of

72

criminality and the consequences of criminal behavior and substitute therefor a program of treatment, training and rehabilitation." Tenn. Code Ann. § 37-1-101(a)(1),(2).[17]

Even when allowed by state law, juveniles are rarely transferred for crimes committed at age 14, even when those crimes are violent. (See Ex. A, Affidavit of Rebecca Turner at 2 (reviewing a confidential data set indicating that transfers of 14-year-old offenders are "extremely rare"); GOA Report (See Pet. Post-Hr'g Br., Doc. No. 86 at PageID# 5731) (even for violent charges in six selected states that allowed transfer of very young offenders, the transfer of any 14-year-old to adult court, even for violent charges, is very rare).

Clinard's age at the time of the offense weighs against transfer.

### h.    Other matter—potential sentence exposure if transferred

The Court has addressed this factor at length above. In summary, Clinard faces a transfer from juvenile court to adult court where, if convicted, he would be subject to a sentence of life or life without parole. Both sentences are unconstitutional if imposed without consideration of "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Miller, 576 U.S. at 480.

The potential sentence to which Clinard would be exposed if transferred therefore weigh against transfer. The Tennessee Supreme Court's recognition of the unconstitutionality of those sentences when automatically applied in Booker lessens that weight.

---

[17] In 2015 amendments to the Tennessee Rules of Juvenile Procedure, the Tennessee Supreme Court stated that Roper, Graham, and Miller's rulings—that the courts must consider a juvenile's "'lessened culpability'" and greater "'capacity for change'" and "especially the unique nature of the juvenile offender"—has guided the Court's formulation of juvenile court proceedings, including requiring counsel for juveniles in transfer hearings. In re Amendments to the Tenn. Rules of Juvenile Procedure, 2015 Tenn. LEXIS 1063, at *39 (Tenn. Dec. 29, 2015).

73

### i.    Other matter—Clinard's time served

The Court cannot ignore that Clinard has been in custody for 18 years. A report from the U.S. Sentencing Commission shows that the mean sentence in America for adults convicted of homicide is roughly 15.8 years. Clinard already has paid a substantial debt to society for his crime.

The Court also cannot ignore that the remedy for a <u>Strickland</u> violation is to put the petitioner back where he would have been absent the violation. <u>See</u> <u>Magana v. Hofbauer</u>, 263 F.3d 542, 553 (6th Cir. 2001). No matter how well-intentioned this Court's efforts to provide an equivalent hearing to the one Clinard's original counsel waived, no ruling by any court can turn back the clock and return Clinard to August 2005.

Clinard's time served weighs against transfer.

### j.    Other matter—Clinard's record in prison

Although this Court is operating under the legal fiction that it is August 2005, the Court cannot escape the reality that Clinard has been in prison since he was 14 years old. Thus, during the April 2023 hearing, the Court inquired about Clinard's time in prison. (<u>See</u> Hr'g Tr., Doc. No. 132 at PageID# 6061-62). The State stated, "I think to be fair to Mr. Clinard – my understanding is that he has been very good in TDOC custody." (Watkins, Hr'g Tr., Doc. No. 132 at PageID# 6069).

As for mental health, Clinard has taken the prison's anger management class. As for education, Clinard entered custody as a ninth grader and earned his GED in prison. He is now enrolled in an Associate's degree program at the Northeast State Community College, and he works as a GED tutor for other prisoners. As for vocational skills, he previously worked as a plumber, and he earned a certificate in carpentry. He is mid-way through an electrician's certificate, but a teacher is not presently available for the program. (Hr'g Tr., R.132, PageID#

74

6061). His behavior and choices in prison over the past eighteen years show that Clinard is, in fact, capable of rehabilitation.

This "other matter"—Clinard's prison record—weighs against transfer.

### k. Weighing the Factors of Tenn. Code Ann. § 37-1-134(a)(4)(C) and Other Matters

To determine whether the interests of the community require Clinard be put under legal restraint or discipline, the Court has considered the six factors of Tennessee Code Annotated § 37-1-134(b) and "other matters" the Court finds relevant, including his age at the time of the offense, his potential sentence exposure if transferred, his time already served, and his record in prison.

The Court has determined that the third and fourth factors weigh in favor of transfer; the first, second, fifth, and sixth factors weight against transfer; and the "other matters" considered by the Court weigh against transfer. However, the determination of whether there are reasonable grounds to believe that the interest of the community requires that Clinard be put under legal restraint or discipline is not a simple mathematical calculation. See State v. McGill, No. M2013-01076-CCA-R3CD, 2014 WL 1413875, at *7 (Tenn. Crim. App. Apr. 11, 2014) (stating that "the balancing of these factors is not simply a matter of counting how many have been met").

Foremost in this analysis is the fact that Joyce Gregory was important to her family, friends, and community, and her untimely death at Clinard's hands was tragic.

Jason Clinard was only 14 when he committed this offense. His parents, teachers, and football coach testified that he is a kid with good character. In the months before the shooting, he was under an unusual amount of stress for a child his age. He became severely depressed and experienced visual and auditory hallucinations. Clinard also was dealing with anger issues. He became suicidal and contemplated specific ways to kill himself after two classmates attempted suicide with guns, and his grandmother and dog died. He lacked the coping skills, resources, and

75

maturity to deal with his stress and depression appropriately. After having only two minor disciplinary infractions on his ten-year school record, Clinard recently began getting in trouble at school for using tobacco and talking back to a teacher. Others noticed that his behavior had changed. His parents, while well-meaning, were busy with work, multiple foster children, health issues of their own, and visiting family members who were hostile to Clinard in his home.

On the morning of March 2, 2005, Clinard was suicidal and angry with easy access to some forty guns. With one of those guns, he committed a horrendous act. Although he initially ran into the woods after shooting Gregory, Clinard did not run from his actions. He surrendered himself without incident very shortly after the shooting. He readily confessed to a TBI Agent. He said he wished he could turn back time. He acknowledged that he was going to be put in jail and said that he would enter a guilty plea.

At age 32–after eighteen years in custody—Clinard agrees that it did not make any sense to shoot himself or anyone else to escape how he felt on the morning of March 2, 2005. He feels "horrible" about what he did, and he fully understands that "it's something a man can't take back." But Clinard was not a "man" in the eyes of the law when he shot Ms. Gregory.

Clinard was a child experiencing severe depression and anger who lacked inadequate coping skills. Experts explained that this combination of factors led to disproportionate shame, distress, and suicidal ideation which primed Clinard to shoot Gregory instead of himself. As Dr. Currey explained: "Suicidal thoughts in children sometimes reflect feelings of guilt and shame that can manifest in self-destructive behaviors, or in aggression towards others." (Currey Report, CEX at P10).

The Supreme Court has stated that, "[f]rom a moral standpoint, it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's

character deficiencies will be reformed." <u>Roper</u>, 543 U.S. 551, 570. That is because children are, with rare exceptions, capable of treatment, training, and rehabilitation.

The weight of the evidence presented at the new juvenile transfer hearing shows that, in 2005, Clinard was capable of being successfully treated and rehabilitated at or before the more than four years he is eligible to serve in juvenile detention. Dr. Bernet believes that "[t]he mental conditions that led to Jason's violent behavior in the past are treatable." According to Dr. Bernet, the "usual treatment for major depressive disorder and intermittent explosive disorder in an adolescent with a serious degree of externalizing behaviors is individual and group psychotherapy in the context of a highly structured treatment program in a residential setting." Dr. Bernet states with a reasonable degree of medical certainty that Clinard "definitely" can overcome his depression with treatment provided through the juvenile justice system before the conclusion of his four years in juvenile detention. (Doc. No. 83 at PageID# 5489). He further states that Clinard can get control of the intermittent explosive disorder with cognitive behavior therapy as he believes that Clinard had a mild version of intermittent explosive disorder. He reports that Clinard "appeared motivated for treatment and very interested in resolving these conditions and any symptoms associated with them." (Bernet Report, CEX at P36). He notes that Clinard participated appropriately in the treatment program when he was at MTMHI. (<u>Id.</u>)

Even if his depression recurs, Dr. Bernet believes it can be treated. Dr. Currey notes that "[a]dolescents with similar histories typically respond best to therapeutic, supportive, structured, organized living environments where the goals, consequences, and rewards are clear" (MTMHI Report, CEX at P10), and DCS can provide that environment.

Dr. Bernet opines that the shooting was "one single very serious but out-of-character incident" for Clinard. Both Drs. Currey and Bernet believe that Clinard poses a low risk of further

violence. In fact, Dr. Bernet says the risk of Clinard acting again in a seriously violent and harmful manner is "approximately the same as an average citizen on the street." That is because, in part, the most serious external stressors that contributed to Clinard's violent behavior have ended or resolved themselves. In addition, Clinard "does not manifest some of the most important risk factors for future violent behavior" such as gang involvement; prior record of delinquency; history of chronic, frequent, and recent violence; early onset of violent behavior; substance abuse involved in his violent behavior; family structure in which aggression was modeled as acceptable; maladaptive personality traits such as lack of empathy; physical or sexual abuse; or the MAOA gene that has been associated with violence. Further, Dr. Bernet noted "protective factors" in Clinard's history "that should reduce the risk of future violent behavior" including his intact family, supportive parents, appropriate peer relationships, and a fairly good academic record.[18] Plus, his track record of behaving well and applying himself at home and school was a positive factor indicating a reduced risk. Dr. Bernet opines: "I think what he did was extremely out of character. And I think that the future, his day-to-day behavior is going to be driven by his basic personality, not by that incident that happened one time." (Doc. No. 83 at PageID# 5492).

There are no guarantees that Clinard will not reoffend. But the law does not ask the Court to make that determination. Rather, the law requires the Court to determine whether the "interests of the community require that [Clinard] be put under legal restraint . . . ." Tenn. Code Ann. § 37-1-134. Considering the testimony given at the 2019 and 2023 remedial hearings and the evidence as a whole, the Court finds that the community's interests do not require that Clinard be so restrained. The petition to transfer Clinard to adult court will be denied.

---

[18] Clinard's family attended his April 19, 2023 hearing "to support him." (Doc. No. 148 at PageID# 6203).

## V.    CONCLUSION

For the reasons explained in detail herein, Petitioner's Motion to Dismiss Petition to Transfer (Doc. No. 104) will be denied.

And although there are reasonable grounds to believe that Clinard committed the delinquent act as alleged, Clinard is not committable to an institution for the developmentally disabled or mentally ill, and the interests of the community do not require that Clinard be put under legal restraint or discipline. Consequently, the State of Tennessee's petition to transfer Clinard to adult court will be denied.

Clinard's 2008 conviction and sentence for first-degree premeditated murder in the Circuit Court of Stewart County, Tennessee therefore will be vacated and set aside, and Clinard will be released from the custody of the Tennessee Department of Correction.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE